GEORGE E. AND GRACE L. VANDENHOFF, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Vandenhoff v. Commissioner
Docket Nos. 11786-82, 11787-82, 11789-82.
United States Tax Court
T.C. Memo 1987-116; 1987 Tax Ct. Memo LEXIS 112; 53 T.C.M. (CCH) 271; T.C.M. (RIA) 87116; February 26, 1987. Jerome R. Rosenberg, for the petitioners. Paulette Segal and Alice Fitzpatrick, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: In these consolidated cases, respondent determined deficiencies in petitioners [2] Federal income taxes for the year 1978 as follows: Petitioners
Docket No.
Deficiency
George E. Vandenhoff
11786-82
$40,130.00
("Vandenhoff") and
Grace L. Vandenhoff
Sun Y. Wong ("Wong")
11787-82
$39,473.87
and Janet L. Wong
David Pasant ("Pasant")
11789-82
$41,408.00
and Christine Pasant
The deficiencies in dispute arise from petitioners' involvement in Laurel Associates ("Laurel") limited partnership. Laurel is a New York limited *115 partnership organized to purchase and exploit feature motion pictures. The issues for decision are (1) whether petitioners, as limited partners of Laurel, are entitled to deductions for their distributive shares of loss reported by Laurel and, if so, in what amounts; and (2) whether petitioners are entitled to investment tax credits. FINDINGS OF FACT Some of the facts have been stipulated and are incorporated herein by this reference. At the time the petitions herein were filed, each petitioner maintained a legal residence within the state of California. Laurel was organized under the laws of the state of New York as a limited partnership on June 1, 1978. Daniel Glass ("Glass") and Stephen Sharmat ("Sharmat") were the general partners of Laurel. Twenty-eight investors became limited partners in Laurel. Glass and Sharmat each had prior experience in the negotiation of distribution agreements with major motion picture distributors. Glass has been a practicing attorney with a specialization in the entertainment field for several years and is a partner in the law firm of Migdal, *116 Tenney, Glass & Pollak. Glass has served as general counsel to Screen Gems, the television subsidiary of Columbia Pictures, where he also served as business affairs manager responsible for the negotiation of various industry related agreements. Glass has specific experience as an entertainment law specialist concerning the negotiation of employment contracts, distribution agreements, financing agreements, and production budgets. Glass has been an organizer or general partner of other motion picture limited partnerships. Sharmat has had extensive experience in the production and financing of motion picture and television projects. Sharmat has experience financing such opportunities within the United States, England, Germany, Australia, and Japan. He has also conducted seminars and lectures on financing motion pictures. Sharmat has been associated as an organizer or general partner of other motion picture partnerships. As general partners of Laurel, Glass and Sharmat negotiated with Warner Brothers, Inc. ("Warner"), to purchase the motion picture "Bloodbrothers" (sometimes hereinafter referred to as "the film"). The film focuses upon the intrafamily conflicts of a working class *117 Italian family in New York, New York. The cast of the film included Paul Sorvino, Tony LoBianco, and Richard Gere, who in later years became a major box office attraction. The producer of the film was Stephen Friedman. Robert Mulligan directed the film. The screenplay was written by Walter Newman. Sidney Kiwitt ("Kiwitt") served as a vice-president to Warner during the year in issue. Kiwitt's responsibilities to Warner included the location of risk capital. Risk capital is the amount of cash advanced to finance production costs. Warner sought outside risk capital to finance approximately twenty-five percent (25%) of the actual production costs including overhead of the motion pictures it produced. The total production costs of "Bloodbrothers" was $5,120,499.01. Kiwitt represented Warner in the negotiation of the transactions at issue and had negotiated prior motion picture agreements with Glass and Sharmat regarding the location of risk capital in his capacity as a vice-president of Warner. It was Kiwitt's experience that, generally, one out of five motion pictures was successful. Everett Rosenthal ("Rosenthal") was the sole shareholder and principal officer of Cincoa *118 Funding, Inc. ("Cincoa"). Cincoa was formed some years prior to the transaction at issue to raise funds in conjunction with Rosenthal's capacity as president of FRP Productions ("FRP"). The principal business purpose of FRP was to service the motion picture industry concerning production services in the New York City area and to finance completion guarantees. Production services included providing stage props and studio rentals. Completion guarantees within the motion picture industry are agreements to provide additional funding in instances where a producer or studio had exceeded production budget agreements and required additional capital investment to complete the production. Cincoa was formed to assist FRP in the location of completion guarantee capital. However, Cincoa was an inactive company during the year in issue. Rosenthal had become acquainted with Glass in prior years through the completion guarantee aspect of FRP's business. Glass had represented Rosenthal as legal counsel in an unrelated motion picture distribution dispute. Glass approached Rosenthal to involve Cincoa in the transactions at issue. Rosenthal did not negotiate with Warner regarding the film proposal. *119 Glass and Sharmat negotiated all arrangements with Warner. As to the role of Cincoa, the terms of the film proposal were fait accompli upon presentation to Rosenthal. On June 1, 1978, the simultaneous transactions at issue were executed. Pursuant to terms negotiated between Warner and the general partners of Laurel, Warner executed with Cincoa a document titled "Purchase Agreement" ("Warner-Cincoa Agreement"). The Warner-Cincoa Agreement provided for the transfer of the copyright to the film to Cincoa. Cincoa agreed to pay Warner $5,000,000.00 for the worldwide rights to the film except any interest whatsoever in and to: (a) Any of the literary and/or dramatic material contained in the Picture or upon which the Picture is based and the copyright and any renewals and extensions thereof (all said literary, and/or dramatic material being hereinafter collectively called the "Property"), except to the extent necessary to allow Purchaser to distribute the Picture throughout the world or license the manufacture and sale of musical phonograph records, tapes, cartridges, cassettes, whether in album or single record form or otherwise, throughout the world; (b) Any right to use, exercise, *120 employ and exploit all of the characters, situations, objects, properties, wardrobe designs, equipment or events depicted, described or portrayed in the Picture. (c) Any right to perform on radio and/or television any number of programs based upon the Picture or any part thereof. Pursuant to the Warner-Cincoa Agreement, Cincoa paid Warner $1,125,000.00 in cash. The debt portion of the Warner-Cincoa Agreement in the amount of $3,875,000.00 together with interest of eight and one half percent (8 1/2%) per annum from September 30, 1978, was to be satisfied no later than September 30, 1985. Cincoa's debt portion of the purchase price was a nonrecourse obligation payable solely from the "Net Producer's Share of Gross Receipts" from the film as defined within "Paragraph 20 of that certain Distribution Agreement contemplated to be entered into concurrently herewith between Seller [Warner] and Laurel Associates * * *." [3] The Warner-Cincoa Agreement warranted that Warner's books would reflect a total production cost in the film of not less than $5,000,000.00. On August 3, 1978, Warner notified MGM Laboratories, who held possession of the film, that Warner had sold the film and the *121 copyright to Cincoa with retention of a security interest in the film. Laurel executed a document titled "Purchase Agreement" with Cincoa ("Laurel-Cincoa Agreement") also on June 1, 1978, as part of the simultaneous and integrated transactions at issue. The terms of the Laurel-Cincoa Agreement provided that Laurel pay Cincoa the amount of $4,985,000.00 for Cincoa's entire rights to the film acquired under the Warner-Cincoa Agreement except "television syndication rights (as that term is understood in the motion picture and television industries); as distinguished from other television rights such as cable television * * * or any other ancillary rights and/or albeit rights (including, without limitation, theatrical stage rights) in or to the Picture or the Property." Cincoa has not sold television syndication rights to the film as such rights are defined within the industry. *122 The cash portion of the Laurel-Cincoa Agreement in the amount of $1,125,000.00 was paid by Laurel to Cincoa upon delivery of the film. Cincoa paid Warner all cash received from Laurel as part of the Warner-Cincoa Agreement. The debt portion of the Laurel-Cincoa Agreement in the amount of $3,860,000.00 provided for interest at eight and one half percent (8 1/2%) per annum calculated from August 31, 1978, until such debt portion of the agreement is satisfied, which shall not be later than September 30, 1982. The debt portion of the Laurel-Cincoa Agreement was evidenced by a non-negotiable, contingent nonrecourse promissory note labeled as a "full recourse" Promissory Note dated June 1, 1978 ("the June Promissory Note") executed between Laurel and Cincoa. The June Promissory Note incorporated the terms of the Laurel-Cincoa Agreement and was made pursuant to and subject to such agreement. [4]
The *123 Laurel-Cincoa Agreement provided that each partner of Laurel separately execute and deliver to Cincoa a document entitled "Guarantee" pursuant to which each limited partner assumed liability for such partner's proportionate share of the debt portion of the Laurel-Cincoa Agreement evidenced by the June Promissory Note. The Laurel-Cincoa Agreement further provided that "said guarantees shall terminate and the principal amount of the Note [the June Promissory Note] shall become nonrecourse when the gross receipts (as defined in that certain Distribution Agreement to be entered into concurrently herewith by and between Purchaser [Laurel] and Warner * * *) collected and reported by the distributor [Warner] shall equal $7,500,000.00 or when gross receipts from network cable television exploitation collected and reported by the distributor aggregate $1,500,000.00 whichever is sooner." If the June Promissory Note should become nonrecourse, the Laurel-Cincoa Agreement specified that "no default thereafter shall in any event result in any personal deficiency judgment against Purchaser [Laurel] or any of its partners." Each petitioner executed an assumption agreement as guarantor pursuant *124 to a document entitled "Guarantee" which guaranteed such petitioners' share of the June Promissory Note. On July 31, 1978, Glass, as a general partner of Laurel, wrote Cincoa to inform Rosenthal that the terms of the debt portion of the Laurel-Cincoa Agreement as evidenced within the June Promissory Note were to be altered. The correspondence stated that the June Promissory Note was to be cancelled, terminated, and returned to Laurel in exchange for a new promissory note to be executed and delivered by Laurel in the form annexed to such correspondence ("the July Promissory Note"). The July Promissory Note provided that the debt portion of the Laurel-Cincoa Agreement in the amount of $3,860,000.00 was not altered; however, the interest rate was increased to eight and three eights percent (8 3/8%) per annum to be calculated from July 1, 1978, until the date such note is satisfied and that the maturity date shall be January 2, 1985. Contrary to the terms of the Laurel-Cincoa Agreement incorporated as part of the June Promissory Note, the July Promissory Note provided that in no event shall the principal amount of the debt portion of the Laurel-Cincoa Agreement become nonrecourse *125 at any time as the July Promissory Note "shall be full recourse against the maker hereof." The July Promissory Note appended to the correspondence of July 31, 1978, was dated June 1, 1978. The limited partner guarantee provisions were not altered by the July Promissory Note amendments. Rosenthal did not negotiate the altered terms concerning the contingent nonrecourse nature of the debt portion under the Laurel-Cincoa Agreement. Glass was motivated to alter the contingent nonrecourse nature of the debt portion of such agreement to recourse by an intent to comply with the at risk provisions of section 465. [5] The July Promissory Note was also executed pursuant to and subject to the Laurel-Cincoa Agreement so as to incorporate the unaltered terms of such agreement. Cincoa did not demand that Laurel pay quarterly interest on the July Promissory Note as provided within the Laurel-Cincoa Agreement nor has Laurel paid any principal or interest on such note. The Warner-Cincoa Agreement provided that the debt portion of the purchase *126 of the film would be payable solely out of seventy-five percent (75%) of the Net Producer's Share of Gross Receipts. The debt portion of the Laurel-Cincoa Agreement as modified by the July Promissory Note deleted the contingent nonrecourse nature of the debt portion so as to be in fact full recourse. Rosenthal stated his intent to enforce the recourse provisions of the July Promissory Note and the limited partner guarantee provisions of the Laurel-Cincoa Agreement even though Cincoa has no obligation to Warner concerning the debt portion of the Warner-Cincoa Agreement other than the stated percentage of Net Producer's Share of Gross Receipts. Laurel notified Warner on August 3, 1978, that it had purchased from Cincoa the worldwide right, title and interest which Cincoa had acquired from Warner, except television syndication rights as defined within the Laurel-Cincoa Agreement. Laurel also entered into a distribution agreement (Laurel Distribution Agreement) with Warner on August 3, 1978. The Laurel Distribution Agreement was to be in effect for perpetuity as no specified or defined term limited the application of its terms. Laurel had no right to cancel or terminate the agreement *127 with Warner for any reason including but not limited to bankruptcy or insolvency. The sole remedy of Laurel as to any failure of Warner was an action for damages. The Laurel Distribution Agreement provided that Laurel execute and deliver a laboratory access letter directing MGM Laboratories, Inc., to accord Warner sole access to pre-print materials of the film. Pursuant to the Laurel Distribution Agreement, Warner was entitled to make such changes, additions, alterations, or cuts to the film as Warner may require. However, Laurel "shall not make any changes, additions (including, but not limited to narration) alterations, cuts, interpolations, or eliminations" to the film. Laurel agreed to secure a line of credit in the amount of $2,000,000.00 to provide advertising funds to Warner as and when required by Warner to cover the cost of the advertising campaign. Warner had sole discretion to determine the amount of any advertising advance required from Laurel. Laurel received the line of credit with Security Pacific National Bank ("Security"). No amount was borrowed by Laurel from Security pursuant to the credit terms as Warner never exercised the right to require an advertising *128 advance from Laurel. Warner expended the amount of $1,591,617.00 for advertising and publicity as of December 31, 1983. Such sum reduced gross receipts reported by Warner as distribution expenses pursuant to the Laurel Distribution Agreement. Warner produced a top quality press book as part of the film's promotional package. Under the Laurel Distribution Agreement, Warner was entitled to distribution fees of thirty percent (30%) of the gross receipts from the United States and Canada, thirty-five percent (35%) of the gross receipts from the United Kingdom, and forty percent (40%) of the gross receipts from other sources. The Laurel Distribution Agreement allocated the following additional distribution fees to Warner: (e) additional bonus distribution fees as follows: (i) sums equal to Ninety-One and One Quarter Percent (91.25%) of the gross receipts in excess of moving breakeven (as the terms "gross receipts" and moving "breakeven" are defined * * *) derived in the United States and Canada; and (ii) sums equal to Ninety-One point eight seven five percent (91.875%) of the gross receipts in excess of moving breakeven derived from the world excluding the United States and *129 Canada; * * * Under the Laurel Distribution Agreement, the term "gross receipts" excluded television syndication rights, as such rights were retained by Cincoa under the Laurel-Cincoa Agreement and licensed to Warner under a separate distribution agreement between Cincoa and Warner. The term "gross receipts" was net of all costs incurred by Warner and recoupable as distribution expenses. The term "breakeven" was defined to occur when aggregate gross receipts equaled the sum of the following: (i) Warner's distribution fee (ii) advertising advance by Laurel not to exceed $2,000,000.00; (iii) distribution expenses to Warner; (iv) $5,000,000.00 plus interest therein at eight and one half percent (8 1/2%) from August 31, 1978 until the accounting period during which such sum is recouped. Interest recouped in priority; (v) all contingent amounts and deferments consented to by Warner not included in the cost of the production based upon gross receipts such as fees to actors, directors, and writers. The term "moving breakeven" is defined as breakeven determined at the close of each accounting period. By correspondence dated August 3, 1978, Laurel directed that Warner pay *130 directly to Cincoa seventy-five and one-quarter percent (75.25%) of the Net Producer's Share of Gross Receipts allocated by Laurel to satisfy the debt portion of the Laurel-Cincoa Agreement. Also by correspondence dated August 3, 1978, Cincoa directed that Warner retain seventy-five percent (75%) of such Net Producer's Share of Gross Receipts to reduce the debt portion of the Warner-Cincoa Agreement and pay one-quarter percent (.0025%) of the Net Producer's Share of Gross Receipts to Cincoa until twenty-five percent (25%) of such amount shall aggregate $1,125,000.00 plus interest calculated at eight and a half percent (8 1/2%) per annum from September 30, 1978, and thereafter one hundred percent (100%) of Net Producer's Share of Gross Receipts until such amount shall aggregate $3,875,000.00 plus interest as stated. These sums retained by Warner are applied to reduce the debt portion of Cincoa's nonrecourse obligation to Warner. Pursuant to separate agreements dated August 3, 1978, Laurel and Cincoa agreed to permit Warner to retain any sums owed to Laurel which were specified to reduce the debt portion of the Laurel-Cincoa Agreement and to instruct Warner to reduce Laurel's debt *131 to Cincoa and to simultaneously reduce the debt portion of the Warner-Cincoa Agreement. Consequently, Warner retained any such sums. William A. Madden ("Madden") has more than 50 years of experience in the movie business, having been employed with Metro-Goldwyn-Mayer ("MGM") for forty-five years. At MGM, Madden was corporate vice-president and general sales manager and was responsible for the evaluation, distribution, and marketing of motion pictures. Madden is a voting member of the Motion Picture Academy of Arts and Sciences. Madden opined that the film had no theatrical value as of June 1, 1978, as marketing expenses would exceed estimated income based on 500 theatrical bookings. Madden's view was that excessive profanity and endless intrafamily conflicts emphasizing troublesome societal issues precluded an optimistic estimate of theatrical bookings as of the release date. Robert M. Newgard ("Newgard") has experience within the motion picture and television industry since the year 1952. Newgard was in charge of television sales for Avco Embassy Pictures during the period 1976 to 1980. Newgard is a television and motion picture consultant concerning the purchase and evaluation *132 of such products. Newgard determined the fair market value of the film as of June 1, 1978, to be $300,000.00 comprised entirely of pay cable revenue. Newgard viewed the production value to be average, however, he viewed the cast performance to be negated due to the profanity and the unsavory plot. Newgard estimated no network television revenue. Max E. Youngstein ("Youngstein") has experience in the motion picture and television industry for forty-five years and has participated in the legal, production, distribution, advertising, publicity and promotion aspects of such industry. Youngstein is a member of the academy of Motion Picture Arts and Sciences. Youngstein estimated the fair market value of the film on June 1, 1978, to be $5,000,000.00. Youngstein estimated theatrical revenue in the amount of $10,000,000.00 and non-theatrical revenue in the amount of $8,000,000.00 from sources such as network television, pay cable television, syndicated television, and sales of home video cassettes. Youngstein opined that, in general, a film production cost of $5,000,000.00 must yield $15,000,000.00 in gross revenue to breakeven. The director's contract provided for the right of *133 final cut regarding the film. The director, Robert Mulligan ("Mulligan"), adamantly refused to re-edit the film or to permit anyone else to re-edit the film prior to theatrical release. At some point in time, Mulligan did permit cover shots required to broadcast the film on network television. Sharmat wrote Glass on August 23, 1978, to express concern with the excessive profanity and superfluous scenes which should require six to seven minutes of cutting. Sharmat also expressed concern that the musical score was outdated. In Sharmat's view, Warner should take advantage of its ownership of Atlantic Records to contract a top songwriter to develop a score because the film had the potential equivalent of "Saturday Night Fever" if proper scoring was developed. Sharmat noted that Warner "is notorious for letting directors have their head and they are reluctant to make suggestions to directors for fear that directors will consider them intruders." Sharmat also wrote in the correspondence of August 23, 1978, that he was aware that Warner was "not concerned about our financing for 'Bloodbrothers' because if we do not do it they pick up our share of 'Hooper,'" a successful motion picture. *134 Sharmat concluded the correspondence of August 23, 1978, with the statement that "I may be shouting into the wind but the film has great promise and I sincerely believe that, with the above recommended changes, would be a largely successful film and a prime candidate for awards. Please think carefully of how we could make this happen because if we could we would force our investors to participate." The closing date to purchase a limited partnership interest in Laurel was extended from July 15, 1978, to August 15, 1978, and further extended to September 26, 1978, as the general partners had difficulty finding investors. The film was scheduled for release on September 27, 1978. A one unit limited partner interest in Laurel cost $42,000.00 in total, of which $2,500.00 was required to be paid on signing the agreement, $17,500.00 due on or by December 1, 1978, $7,000.00 due on or by February 15, 1979, and $15,000.00 due on or by February 15, 1980. Vandenhoff paid the entire cost on signing the agreement. Wong made installment payments per the payment schedule indicated. Pasant purchased a one-half unit and made installment payments per the payment schedule indicated. Glass and *135 Sharmat, the general partners, each contributed cash in the amount of $5,000.00 on signing the agreement. The February 15, 1979, and the February 15, 1980, cash contributions in the amounts of $232,000.00 and $472,000.00, respectively, due from the limited partners as capital contributions were secured by recourse letters of credit. Laurel used the letters of credit as collateral to borrow funds in the amount of $1,382,500.00 from Citibank. Laurel deducted the amount of $40,800.00 as interest paid to Citibank during the year in issue. Laurel earned no income in the year 1978. In the years 1980 and 1982, Laurel's sole income was interest income in the respective amounts of $2,240.00 and $349.00. During the period 1978 through 1982, Laurel claimed losses as follows: Year
Loss
1978
$2,618,169.00
1979
2,499,909.00
1980
3,244.00
1981
5,499.00
1982
10,299.00
On its 1978 Federal partnership return, Laurel deducted the following amounts: guaranteed payments to partners
$ 35,000.00
interest
40,800.00
depreciation
2,492,500.00
amortization [6]
2,500.00
other deductions [7]
47,369.00
$2,618,169.00
Laurel paid the law firm of Arnold *136 & Porter the amount of $8,236.36 for legal services on November 3, 1978. Laurel paid the accounting firm of Oppenheim, Appel & Dixon the amount of $10,000 on November 2, 1978. Laurel deducted one half of such legal fees and accounting fees on its 1978 Federal partnership tax return and capitalized one half of such fees as organization costs to be amortized over 60 months as provided in section 709(b). [8]
The Laurel offering memorandum provided that the general partners were to receive fees as follows: FEES
The General partners will receive initial fees aggregating $355,000.00. From that amount, all legal and *137 accounting fees and all expenses for telephone, postage, travel, reproduction and any other expenses (including any offeree representation fees or finder's fees to third parties) incurred in connection with the offering will be paid as more particularly set out in "Application of Proceeds," hereinbelow. The balance will then be retained by the General Partners as compensation for their services to the Partnership in organizing the partnership, negotiating the purchase of the picture, the distribution agreement, financing agreements and the management offering. The General Partners will also receive administrative and overhead fees chargeable as an expense of the Partnership measured by a percentage of the cash flow * * *. Laurel capitalized as syndication costs the amount of $152,719.00. Laurel deducted the amount of $35,000.00 paid to Glass and Sharmat as a guaranteed payment for administrating and managing the operations of Laurel. Laurel capitalized as an organization cost the amount of $15,881.00 paid to the law firm of Migdal, Tenney, Glass & Pollak for legal services and other services in connection with the operation of the partnership. Glass is a senior partner of such *138 firm. Laurel allocated $38,000.00 of the amount paid to such firm for administrative services and deducted such amount. Glass received the amount of $38,000.00 from the firm. Warner collectively paid Glass and Sharmat an Associate Producer's fee in the amount of $50,000, payable upon the receipt by Warner of the cash portion of the Warner-Cincoa agreement from Cincoa. Laurel depreciated the motion picture using the straight-line method of depreciation with a two- year useful life and claimed a depreciable basis in the amount of $4,985.000.00. Laurel claimed an investment tax credit basis of new investment property in the amount of $1,125,000.00. On November 16, 1978, Glass directed a memorandum to all investors in the film. The memorandum informed the investors as follows: From information conveyed to me by Warner Bros. it is clear that, despite many favorable reviews, the Picture has been an enormous commercial disappointment. In fact, the results have been so disappointing, Warner Bros. has decided to withdraw the Picture from distribution at the end of the month with the intention of re-editing * * *. * * * Obviously, it is difficult at this time to estimate the future *139 prospects of the Picture. We hope that the Picture will benefit from the changes contemplated to be made and that when it is released in the spring of 1979 significant revenue will be realized. In addition, it is hoped that a substantial network television sale can be made. * * * In August of 1979, Warner licensed broadcast rights to Home Box Office, the pay cable service. Warner licensed one network broadcast to the National Broadcasting Company ("NBC") in the amount of $1,750,000.00 for the broadcast period September 1, 1983, to August 31, 1985. NBC viewed an edited version of the film prior to signing the network broadcast agreement with Warner. The edited version which covered over or deleted the profanity of the original film was approved by NBC's broadcast standard department. OPINION The initial focus of our inquiry is to determine the ownership interest, if any, acquired by petitioners as limited partners of Laurel. Petitioners assert that Laurel acquired its entire interest in the film under the Laurel-Cincoa Agreement for payment in the amount of $4,985,000.00. Respondent asserts that Laurel did not purchase an ownership interest in the film as the integrated *140 transactions, though in the form of a sale, were in fact devoid of economic substance. Respondent alternatively posits that Laurel, in essence, financed a portion of the film to offset the investment of Warner such that Laurel purchased, at most, a speculative future profits interest in the film in addition to the tax benefits attendant to motion picture investments. At the outset, we shall address the question as to whether Cincoa served a business purpose in the transactions concerned or whether Cincoa was involved solely to generate the anticipated tax consequences to the partners of Laurel. Based on our examination of the record we determine that the role of Cincoa in the transactions must be viewed as that of a mere "pass-through" or "strawman entity" inserted into the transaction by the organizers of Laurel solely for characterization for tax purposes. Cf. Tolwinsky v. Commissioner,86 T.C. 1009, 1037 (1986); Law v. Commissioner,86 T.C. 1065, 1092 (1986). Transactions which serve no "purpose, substance, or utility apart from their anticipated *141 tax consequences" are disregarded for tax purposes. Knetsch v. United States,364 U.S. 361 (1960); Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). The record presents no doubt that the transactions at issue were structured by and negotiated between Laurel and Warner with the interests of such parties in concern. Laurel purportedly purchased the film excluding certain television syndication rights from Cincoa. Cincoa retained television syndication rights as defined within the industry; however, we find that such rights were highly speculative and of insignificant value. We are convinced that such rights were merely incidental and inserted into the transaction so as to create the appearance of business purpose. It is without question that Glass and Sharmat as the organizers of Laurel are the individuals who structured the transactions with Warner. Glass and Sharmat on behalf of Laurel presented Rosenthal with the terms of the transactions at issue. Relevant documents and correspondence were negotiated and drafted by either Glass and Sharmat or Warner. The role of Cincoa was merely to *142 provide a means by which Laurel appeared to purchase the film on a recourse basis for purposes of the "at risk" provisions within section 465. The insertion of Cincoa also provided a nonrecourse arrangement arrangement which Warner retained entitlement to claim the investment tax credit on the nonrecourse debt portion of the Warner-Cincoa Agreement. Laurel claimed investment tax credit basis in the amount of the $1,125,000.00, the cash portion of the Laurel-Cincoa Agreement passed to Warner under the Warner-Cincoa Agreement. We find no credible business purpose was served by Cincoa. Our determination that Cincoa be disregarded for tax purposes is re-enforced by the facts and circumstances attendant to the issuance of the July Promissory Note. The Laurel-Cincoa Agreement provided that each partner of Laurel separately execute and deliver to Cincoa a guarantee of such partner's proportionate share of Laurel's debt as evidenced by the June Promissory Note. The Laurel-Cincoa Agreement provided that the partner guarantees shall terminate and the principal amount of the debt portion of the agreement shall become nonrecourse upon the attainment of certain income objectives by Warner. *143 The partner guarantees were intended to provide that limited partners of Laurel be "at risk" for purposes of section 465 concerning the debt portion of the Laurel-Cincoa Agreement. On July 31, 1978, Glass appended the July Promissory Note, dated as of June 1, 1978, to correspondence directed to Cincoa. Glass altered the terms of the Laurel-Cincoa Agreement as evidenced by the July Promissory Note. The July Promissory Note provided that the debt portion of the Agreement shall remain recourse and in no event shall become nonrecourse. The July Promissory Note increased the rate of interest and altered the maturity date. Rosenthal on behalf of Cincoa merely accepted the altered terms as presented by Glass. Such altered terms were of some benefit to Cincoa due to the increased rate of interest. Nonetheless, the benefit was of insignificant value to the highly speculative nature of the motion picture industry and the terms of Warner's exploitation of the film. We find determinative the fact that Rosenthal merely accepted the new terms presented by Glass. It is obvious that Cincoa served Laurel and Warner as a mere "pass through entity" or "strawman" vehicle to characterize the transactions *144 at issue for tax purposes. The Warner-Cincoa Agreement provided that the debt portion be nonrecourse payable solely out of the "Net Producer's Share of Gross Receipts." In contrast, Cincoa was entitled to enforce the recourse provisions of the Laurel-Cincoa Agreement as well as the partner guarantees. Cincoa certainly did not require the assurance of recourse debt given the circumstances of the obligations to Warner. Cincoa had no obligation to Warner except as specified from the proceeds of distribution. Although Rosenthal stated his intention to enforce the recourse provisions of the Laurel-Cincoa Agreement and limited partner guarantees, Cincoa has not sought payment of the quarterly interest payments nor has Laurel paid any principal or interest concerning the debt portion of the Laurel-Cincoa Agreement. Because of the relationship of Glass and Sharmat with Warner and their control of the form of the transactions here involved, we are convinced that Cincoa never intended to enforce the recourse provisions of the Laurel debt or the limited partner guarantees. See Durkin v. Commissioner, 87 T.C.     (Slip op. at 78) (Dec. 22, 1986). [9] Rosenthal stated his intention *145 to enforce the recourse provisions of the Laurel-Cincoa Agreement and then settle Cincoa's obligation to Warner. It is clear that Cincoa had no obligation to Warner other than the specified allocation of Net Producer's Share of Gross Receipts. We find Rosenthal's testimony to be totally incredible and devoid of merit. We are certain that Rosenthal only intended to cover his flanks with such testimony. We, therefore, conclude that the limited partner guarantees of the debt portion of the Laurel-Cincoa Agreement are not bona fide guarantees and that Cincoa must be disregarded for purposes of determining the nature of the interest acquired by Laurel and the tax liabilities of its partners. See also Tolwinsky v. Commissioner,86 T.C. at 1040; Law v. Commissioner,86 T.C. at 1093; See also Helba v. Commissioner, 87 T.C.     (Oct. 30, 1986).
*146 Whether Laurel became the owner of the film for tax purposes as a result of the transactions with Warner is a question of fact to be determined by reference to the written agreements and the attendant facts and circumstances. Durkin v. Commissioner,supra; Tolwinsky v. Commissioner,86 T.C. at 1041; Law v. Commissioner,86 T.C. at 1095; Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981); Miller v. Commissioner,68 T.C. 767, 776 (1977). The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563 (1965). The transfer of formal legal title to shift the incidence of taxation attributable to ownership of the property where the transferor continues to retain significant control over the property transferred is disregarded for tax purposes. Tolwinsky v. Commissioner,86 T.C. at 1041; Law v. Commissioner,86 T.C. at 1094. *147 See also Helvering v. Clifford,309 U.S. 331 (1940); Helvering v. F. & R. Lazarus Co.,308 U.S. 252 (1939); Hilton v. Commissioner,74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982); Miller v. Commissioner,68 T.C. 767 (1977). "Taxation is not so much concerned with the refinements of title as it is with the actual command over the property taxed - the actual benefit for which the tax is paid." Corliss v. Bowers,281 U.S. 376, 378 (1930). The entitlement to deduct depreciation is not predicated on the mere holding of legal title but rather upon capital investment. Gladding Dry Goods Co. v. Commissioner,2 B.T.A. 336 (1925). We have determined that the role of Cincoa should be disregarded for tax purposes. Consequently, in our determination of the ownership interest acquired by Laurel, we shall focus our review of the record as if the transactions at issue were executed directly between Warner and Laurel. The transfer of title to a motion picture is accomplished *148 through the transfer of both the negative and the copyright. Ownership of a motion picture negative is distinct from ownership of the copyright thereto (17 U.S.C. sec. 27 (1976); 17 U.S.C. sec. 202 (1982) (effective Jan. 1, 1978); Michael Todd Co. v. Los Angeles County,57 Cal. 2d 684, 371 P.2d 340, 21 Cal. Rptr. 604 (1962), and cases cited therein), and ownership of the former without possession of at least certain of the rights encompassed by the latter is commercially valueless. See Misbourne Pictures Ltd. v. Johnson,189 F.2d 774, 776 (2d Cir. 1951). Copyrights are monopolies; "they entitle the owner to prohibit various kinds of reproduction, and to relieve individuals of these prohibitions by licenses." Goldsmith v. Commissioner,143 F.2d 466, 467 (2d Cir. 1944) (L. Hand, J. concurring), affg. on other grounds 1 T.C. 711 (1943). With respect to a motion picture, the exclusive rights that comprise the so-called "bundle of rights," that is a copyright are the rights to produce copies of the motion picture, prepare derivative works based upon the motion picture, *149 distribute copies of the motion picture to the public by sale or rental, exhibit the motion picture to the public, and display still photographs taken from the motion picture to the public. 17 U.S.C. sec. 1 (1976); 17 U.S.C. sec. 106 (1982) (effective Jan. 1, 1978). Such rights may be subdivided indefinitely and may be owned and enforced separately. 17 U.S.C. sec. 201(d) (1982) (effective Jan. 1, 1978). The sale of a motion picture for Federal tax purposes occurs when there is a transfer of all substantial rights of value in the motion picture copyright. No sale occurs if the transferor retains proprietary rights in the motion picture. Durkin v. Commissioner,supra; Tolwinsky v. Commissioner,86 T.C. at 1042-1043. See Carnegie Productions v. Commissioner,59 T.C. 642, 653 (1973); Cory v. Commissioner,23 T.C. 775 (1955), affd. 230 F.2d 941 (2d Cir. 1956). *150 The consideration, for tax purposes, as to whether the benefits and burdens of ownership have been transferred is essentially a factual determination. Leahy v. Commissioner,87 T.C. 56, 66 (1986). The pertinent factors for consideration were outlined in Houchins v. Commissioner,79 T.C. 570, 591 (1982), to be: ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. Grodt & McKay Realty, Inc. v. Commissioner,supra. Among the factors to be considered in making this determination are: (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property. See Grodt & McKay Realty, Inc. v. Commissioner,supra at 1237-1238. * * * [Fn ref. omitted.] Respondent *151 asserts that petitioners in their capacity as limited partners of Laurel did not, in substance, purchase an ownership interest in the film as the transfer of legal title, though in the sole form of a sale, was devoid of all commercial, legal, and economic reality. We agree with respondent that petitioners did not in fact acquire the film. However, we disagree with respondent's assertion that the transactions at issue were devoid of all commercial, legal, and economic reality. The totality of facts and circumstances establishes that the transactions here at issue between Laurel and Warner were not, in substance, devoid of economic significance beyond the anticipated tax benefits. We are satisfied that the negotiations of Glass and Sharmat on behalf of Laurel embodied the indicia of arm's-length dealings. Furthermore, we are satisfied that the fair market value of the film at the date of transfer approximated the amount of $5,000,000.00 within the Warner-Cincoa Agreement. Compare Helba v. Commissioner, 87 T.C.     (Oct. 30, 1986); Falsetti v. Commissioner,85 T.C. 332 (1985). We are also persuaded that the contractual terms of the Laurel Distribution Agreement *152 bear economic significance indicative of a financial interest in the exploitation of the film. We are convinced that the parties intended to adhere to such terms. Nevertheless, we agree with respondent's alternative assertion that Laurel acquired a speculative future profits interest in Warner's exploitation of the film. Our examination of the written agreements and the circumstances surrounding Laurel's acquisition of the copyright and the negative of "Bloodbrothers" as well as the Laurel Distribution Agreement leads us to determine that Warner retained complete and exclusive control concerning the ultimate success or failure of the film. Laurel acquired formal or bare legal title to the copyright and the negative of the film. We find that Warner retained the benefits and burdens of ownership of the film for Federal tax purposes, and that Laurel acquired only an intangible contractual right to payments contingent upon the success of Warner's exploitation of the film. Our recent opinions in Durkin,Tolwinsky, and Law govern our determination. An examination of the relevant agreements reveals that Laurel acquired no substantial ownership rights to the film. Cincoa purportedly *153 obtained from Warner a copyright without sequel rights to the film. Cincoa purportedly sold to Laurel all such rights acquired from Warner except any television syndication rights. Laurel transferred to Warner all the basic rights associated with a copyright retaining a mere "bare" copyright. The integrated transfers resulted in Warner's having the rights to make copies of the film, to exhibit the film, and to otherwise exploit any dramatic material or literary material upon which the film was based. Consequently, Warner held rights to theatrical exploitation, pay television, video cassettes, and commercial television throughout the world. Such enumerated rights combined with sequel rights provided Warner with the entire bundle of rights that is a copyright. Durkin v. Commissioner,supra; Tolwinsky v. Commissioner,supra.
We have determined that Warner retained the benefits and burdens of ownership of the film for tax purposes. The Laurel Distribution Agreement is dispositive of our inquiry as to who benefitted from the integrated transactions at issue. The Laurel Distribution Agreement provided that the distributor's gross receipts [10] be allocated *154 as follows: First Warner is paid a fee of thirty percent (30%) of gross receipts derived within the United States and Canada, thirty five percent (35%) of gross receipts derived within the United Kingdom, and forty percent (40%) of gross receipts derived from other sources. Warner was also entitled to deduct distribution expenses from distributor's gross receipts. The excess receipts, if any, were allocated to Laurel such that seventy-five and one quarter percent (75 1/4%) of such receipts are to be allocated to satisfy the debt portion of the Laurel-Cincoa Agreement and the remainder of any receipts allocated to Laurel until such sum aggregates the cash investment of Laurel, the amount of $1,125,000.00. Once Laurel has recouped its cash investment, all remaining receipts are allocated to the debt portion of the Laurel-Cincoa Agreement. Warner was entitled to an additional bonus distribution of ninety-one and one quarter percent (91.25%) of gross receipts derived in the United States and Canada in excess of breakeven. We are convinced that this allocation of gross receipts in excess of breakeven is indicative of the benefits ownership of the film which inured to Warner. Kiwitt *155 stated that as a general rule one out of five motion pictures are successful. We acknowledge the risk inherent in the motion picture industry. Consequently, it follows that benefits of a successful motion picture would inure to the owner of the film. Here, the Laurel Distribution Agreement presents no doubt that Warner would primarily benefit if the film was successful. Laurel purchased an income interest of eight and three-quarters percent (8.75%) of gross receipts derived within the United States and Canada in excess of breakeven. Furthermore, the term of the Laurel Distribution Agreement was in perpetuity and no limit was placed on the amount of profit which Warner could receive from its distribution efforts. We are satisfied that the terms of the Laurel Distribution Agreement are dispositive of our inquiry of ownership of the film for tax purposes. Nonetheless, we address additional pertinent factors in our determination. We are convinced that Warner exercised complete control concerning *156 the ultimate success or failure of the film. Warner was authorized sole access to the laboratory at which the preprint materials were held. The Laurel Distribution Agreement provided that Warner have the sole and exclusive right to make "changes, additions, * * * alterations, cuts, interpolations and eliminations" as Warner may require to adapt the film as suitable for any exhibition. The Laurel Distribution Agreement was specific that Laurel shall not make any such changes or eliminations. On August 23, 1978, Sharmat directed correspondence to Glass to express his concern as to the excessive profanity, superfluous scenes, and outdated musical score. It is clear from the record that Sharmat perceived certain flaws in the film as of August 23, 1978, prior to theatrical release. Laurel purportedly purchased the film on June 1, 1978. The Laurel Distribution Agreement sets forth with specificity that Laurel had no right to change, alter, cut, or otherwise modify the film as Warner retained "the sole and exclusive right" to effectuate any such modifications. The film's director, Mulligan, had the right of "final cut" which means the film could not be edited without his approval. *157 For some time, Mulligan adamantly refused to edit the film or allow anyone else to edit the film. The right to edit the film became of great importance as cover shots were required by NBC for network television broadcast. Sharmat noted in his correspondence of August 23, 1978, that Warner was typically reluctant to influence the directors of motion pictures. We are persuaded that Laurel had no control to effectuate certain improvements perceived to be necessary prior to release. Any such privilege was retained by Warner. On November 16, 1978, Glass informed the investors of Laurel that the film was "an enormous commercial disappointment" and that Warner intended to withdraw the film from theatrical performances to re-edit. The Laurel Distribution Agreement provides Laurel no rights to determine distribution efforts, editing, or advertising. In this regard, Warner had sole authority to require Laurel draw upon the advertising line of credit not to exceed the amount of $2,000,000.00 from Security. Although Warner did not require any such advance from Laurel, Warner opted to expend a substantial sum for advertising and publicity. Laurel had no power to influence the decision process *158 or to effectuate policy regarding the success of the film. Furthermore, Laurel could not cancel or terminate the distribution agreement with Warner for any reason including bankruptcy or the failure of Warner to make required payments to Laurel. The Laurel Distribution Agreement specified that Laurel's sole remedy for any action at law be limited to damages so as to preclude Laurel from demanding physical possession of the film. Warner could bring legal action in its own name for any copyright infringement. Consequently, we determine that Warner retained substantial control of the film and was the proprietary owner of the film for Federal tax purposes. Finally, our conclusion that Warner retained all substanial proprietary rights to the film is further supported by the significant financial interest retained by Warner in the film. Our examination of the entire record leads us to conclude that Warner, in fact, merely sought to raise risk capital to offset production costs. Kiwitt stated that Warner sought to raise outside risk capital to finance approximately twenty-five percent (25%) of the actual production costs. Total production cost of the film was $5,120,499.01 Warner raised *159 risk capital in the amount of $1,125,000.00 through Laurel. Consequently, Warner offset approximately twenty-five percent (25%) of the production cost. We do not believe that Warner would relinquish ownership of the film for the guaranteed sum of $1,125,000.00 where production costs exceeded $5,000,000.00 and additional payment remained contingent and speculative. Furthermore, the entire thrust of Kiwitt's testimony relates to financing the film rather than selling the film. We are convinced that Warner would not sell the film without retention of the substantial proprietary rights indicative of ownership. We have determined that Laurel purchased an intangible contract right to payments contingent upon the success of Warner's exploitation of the film. Warner's financial interest, combined with the control over the exploitation of the film upon which Laurel's interest depended, clearly indicates that Warner possessed the benefits and burdens of ownership. The only interest acquired by Laurel was a contingent participation in the gross receipts of Warner's distribution efforts. Laurel's cash investment reduced Warner's financial risk in the film, but such payment, without more, *160 does not give Laurel a depreciable interest in the film. Tolwinsky v. Commissioner,86 T.C. at 1047; Law v. Commissioner,86 T.C. at 1097. Because we have determined that Warner was the actual owner of the film for Federal tax purposes, Laurel is obviously not entitled to claim depreciation of the film. Laurel is entitled to depreciate the intangible contractual right to participate in the gross receipts generated by the exploitation efforts of Warner. Durkin v. Commissioner,supra; Tolwinsky v. Commissioner,86 T.C. at 1052, 1053. We now address whether Laurel may include the debt portion of the Laurel-Cincoa Agreement within the amount of its depreciable basis. We have previously determined that the role of Cincoa is to be disregarded for tax purposes and that the limited partner guarantees of the Laurel debt were not bona fide obligations. Consequently, the debt owed by Laurel was a nonrecourse debt obligation owed to Warner for which no limited partner assumed personal liability. We determine that the nonrecourse debt portion of Laurel's acquisition of its contingent participation in the gross receipts of Warner *161 did not represent genuine indebtedness. The debt of Laurel was payable solely out of Laurel's allocation of the Net Producer's Share of Gross Receipts specified within the Laurel Distribution Agreement. The use of a nonrecourse note and a sale leaseback agreement under which payments are geared to interest and amortization on the note does not necessarily deprive the debt of its character as genuine indebtedness. See Estate of Franklin v. Commissioner,544 F.2d 1045, 1047 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Hilton v. Commissioner,74 T.C. 305, 348 (1980). However, such transactions are subject to special scrutiny due to the obvious opportunities for "trifling with reality." Elliott v. Commissioner,84 T.C. 227, 244 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). The nonrecourse nature of the Laurel debt and the provisions for retiring it were mere paper transactions lacking economic substance. Knetsch v. United States,supra;Tolwinsky,supra; *162 Law,supra;Karme v. Commissioner,73 T.C. 1163 (1980). Because we have determined that Laurel purchased a contingent participation in the gross receipts of Warner for cash in the amount of $1,125,000.00, the only benefit, excluding tax consequences, as a result of the retirement of the Laurel debt was, at most, an eight and three-quarters percent (8.75%) participation in the gross receipts of Warner's exploitation. Consequently, we determine that the nonrecourse debt of Laurel lacked economic substance and served no "purpose, substance, or utility apart from the anticipated tax consequences." Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). As noted in Law, the instant case is distinguishable from those cases where the respondent did not challenge the purchaser's ownership of the property acquired. See Law v. Commissioner,86 T.C. at 1100 n. 22. See, e.g., Fuchs v. Commissioner,83 T.C. 79 (1984); Siegel v. Commissioner,78 T.C. 659 (1982); Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). *163 The instant case is distinguishable from our recent opinion in Leahy where the record indicated that the partnership in fact purchased a twenty-five percent (25%) joint venture interest. Leahy v. Commissioner,supra.
Petitioner's expert, Youngstein, estimated the fair market value of the film on June 1, 1978, to be $5,000,000.00. We found Youngstein's valuation to be credible. The actual production cost of the film was $5,124,099.01. Warner warranted to Cincoa as of June 1, 1978, and prior to completion of the film, that production costs of the film would be not less than $5,000,000.00. Production costs may be a reliable indicator of fair market value. Siegel v. Commissioner,supra.We are convinced, based on our examination of the record, that the fair market value of the film on June 1, 1978 was $5,000,000.00. We found Youngstein's appraisal to be the most reliable. Nonetheless, the record establishes that Laurel purchased an intangible contract right to participate in the gross receipts of Warner and not the film itself. The fact that *164 the fair market value of the film approximated the amount of the Laurel-Cincoa Agreement is not determinative as to whether the Laurel debt was genuine because Laurel simply did not purchase the film for Federal tax purposes. Law v. Commissioner,86 T.C. at 1100. However, it is without question that the fair market value of Laurel's participation in the gross receipts of Warner was of significantly less fair market value than the fair market value of the film itself on June 1, 1978. We have noted that the motion picture industry is one of significant risk such that approximately one out of five motion pictures is successful. Laurel acquired at most an eight and three quarters percent (8.75%) participation beyond breakeven. In sum, we determine that the fair market value of Laurel's participation in the gross receipts of Warner as of June 1, 1978, was the amount of $1,125,000.00, the cash portion of the acquisition paid by Laurel. The Laurel debt was not bona fide indebtedness and as such is not included in the Laurel's depreciable basis. Estate of Franklin v. Commissioner,supra;Siegel v. Commissioner,supra;Brannen v. Commissioner,supra. *165 Consequently, Laurel's depreciable basis in the intangible contractual right to participate in the gross receipts of Warner is the amount of $1,125,000.00. Based on our determination as follows, Laurel is entitled to depreciate its interest acquired from Warner utilizing the straight-line method of depreciation over a two-year period. Law v. Commissioner,86 T.C. at 1104; sec. 167(c).[11]
Respondent asserts that petitioners are subject to the limitations within section 183.[12]Whether an activity is engaged in for profit turns on whether the taxpayer has a bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). In determining whether the partnership engaged *166 in the activity for a profit, "all the facts and circumstances with respect to the activity are to be taken into account." Sec. 1.183-2(b), Income Tax Regs.; Jasionowski v. Commissioner,supra;Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). We are convinced that Laurel's *167 motion picture activity was one engaged in for profit. [13] Glass and Sharmat were experienced in the negotiation of motion picture purchase and distribution agreements. Other motion picture partnerships by Glass and Sharmat were previously successful. The facts surrounding the production and the distribution of the film by Warner indicate that Laurel maintained a reasonable prospect of profit given that the motion picture industry is an industry of significant risk. On behalf of Laurel, Glass and Sharmat selected to invest in a motion picture production which starred experienced actors and involved an experienced producer and director. Warner is a reputable and major motion picture distributor. Furthermore, Warner warranted to Laurel that the production budget for the film would not be less than $5,000,000.00. Laurel acquired a commitment to borrow an amount not to exceed $2,000,000.00 from Security to advance to Warner for advertising purposes as required by Warner. Laurel was assured of a well-financed and professional distribution effort by Warner. Although unsuccessful in theatrical distribution, the film was exhibited in major markets. Consequently, we determine that Laurel's *168 motion picture activity related to the acquisition of its participation in the gross receipts of Warner was one engaged in for profit within the meaning of section 183. Respondent asserts that the guaranteed payments, administrative fees, legal fees, and accounting fees were syndication costs or alternatively organization costs. Respondent has stipulated that such amounts were in fact paid. Petitioners assert that such amounts deducted were properly characterized and deducted pursuant to sections 162 and 709(b). Petitioners bear the burden of proof as respondent's determination is presumptively correct. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioners assert that the burden of going forward with *169 the evidence shifts to respondent where the determinations within the statutory notice of deficiency are arbitrary and unreasonable. Helvering v. Taylor,293 U.S. 507 (1935). We find no arbitrary or unreasonable determinations within the statutory notices of deficiency to shift the burden of going forward to respondent. Consequently, petitioners bear the burden of persuasion as well as the burden of going forward as to the deductions at issue. To be deductible by a partnership, a guaranteed payment must satisfy the requirements of section 162, and the rules of section 263 must be taken into account. Sec. 1.707-1(c), Income Tax Regs.; Cagle v. Commissioner,63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976). Section 162(a) generally allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." In determining whether the management fees in the present case are deductible under section 162(a), we look to the nature of the services *170 performed by Glass and Sharmat rather than to their designation or treatment by the partnership. Doyle v. Mitchell Brothers Co.,247 U.S. 179, 187 (1918); Cagle v. Commissioner,63 T.C. at 96. Payments allocable to organizational costs and syndication expenses must be capitalized. Organizational costs, if elected, are amortizable over a 60-month period, but syndication costs are not amortizable. Secs. 263, 709; Estate of Boyd v. Commissioner,76 T.C. 646, 658 (1981); Estate of Thomas v. Commissioner, 84 T.C. at 441, and the cases cited therein. The taxpayer must establish what portion of the fee is allocable to nondeductible capital portions and to deductible expense portions ( Estate of Boyd v. Commissioner,supra), and such allocation must reasonably comport with the value of the services performed. Wildman v. Commissioner,78 T.C. 943, 958 (1982); see also Merians v. Commissioner,60 T.C. 187 (1973). Based on our analysis of record, we determine that the *171 guaranteed payment in the amount of $35,000.00 deducted by Laurel was in the nature of a syndication expense which must be capitalized. Secs. 263, 709. The offering memorandum of Laurel set forth a fee provision which provided that the balance of the initial payment of $355,000.00 after payment of syndication expenses would inure to Glass and Sharmat as payment for their services to Laurel for "organizing the partnership, negotiating the purchase of the picture, the distribution agreement, financing agreements, and the management offering." We find that the guaranteed payment in the amount of $35,000.00 was in the nature of syndication expenses as described in the Laurel offering memorandum. The guaranteed payment as an initial fee was paid in the year of organization and syndication. Additional fees were dependent upon cash flow. Petitioners rely on the fact that Laurel capitalized other syndication costs in the amount of $152,719.00 to persuade our determination. However, such fact is inconclusive to ascertain the nature of the syndication expenses so capitalized and the basis of allocation to deductible expense portions. Furthermore, the testimony of Glass and Sharmat was not *172 persuasive as to the nature of the services provided. Consequently, petitioners have not satisfied their burden of proof to establish that the guaranteed payment was other than in the nature of syndication expenses. The record provides no basis to allocate any portion to organization costs amortizable under section 709(b). We find that Laurel is not entitled to deduct any portion of the guaranteed payment as such payment must be capitalized as a syndication expense. Laurel deducted the amount of $38,000.00 for administrative expenses. Such amount was paid by Laurel to the law firm in which Glass is a senior partner, although Glass ultimately received such amount. Petitioners rely upon the fact that Laurel capitalized syndication costs and organization costs to establish that the allocation to administrative expense is deductible under section 162. Laurel capitalized as an organization cost the amount of $15,881.00 paid to the law firm of which Glass is a senior partner. However, the record provides no basis for the allocation of any amount to administrative expenses. Consequently, we find that the amount of $38,000.00 deducted as an administrative expense is properly chargeable *173 to organization costs to be amortized as provided in section 709(b). Laurel deducted the amount of $4,119.00 as legal fees and the amount of $5,000.00 as accounting fees. Laurel capitalized as organization costs an equal amount of each fee incurred such that one half of each fee was allocated to expenses deductible under section 162. Petitioners have not provided the basis upon which such allocation was determined. Consequently, petitioners have not satisfied their burden of proof. We determine that the legal fees and accounting fees deducted by Laurel were organization costs to be amortized as provided in section 709(b). [14]
Our final issue for determination is whether petitioners are entitled to claim any amount as an investment tax credit with respect to the acquired interest in the film. Respondent's primary assertion is that petitioners are *174 not entitled to any investment tax credit because the transaction with Warner did not constitute a sale for tax purposes. In the alternative, respondent asserts that no investment tax credit is available because Laurel's motion picture activity was not an activity entered into for profit. In essence, respondent asserts under either theory that the film was not qualified property to Laurel for investment tax credit purposes. Petitioners assert an entitlement to claim their proportionate share of the $1,125,000.00 cash portion of Laurel's acquisition. We have determined that Laurel purchased a contractural right to payments contingent upon the gross receipts of Warner. We have also determined that Laurel's motion picture activity was one engaged in for profit within the meaning of section 183. We address petitioner's entitlement to claim their proportionate share of investment tax credit in light of our previous determinations. A taxpayer is entitled to an investment tax credit under section 38 with respect to a motion picture film only if such film is "new section 38 property" (determined *175 without regard to useful life) which is a "qualified film" and limited to the extent that the taxpayer has an "ownership interest" in such film. Sec. 48(k)(1)(A). [15]
A taxpayer may have an "ownership interest" in a motion picture for purposes of the investment credit even if the taxpayer has neither legal title to nor a depreciable interest in the motion picture. Section 48(k)(1)(C) provides that a taxpayer's "ownership interest" in a qualified film "shall be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film." The existence and extent of an ownership interest is determined at the time the film is placed in service. Sec. 1.48-8(a)(4)(ii), Income Tax Regs.; S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 230. In enacting section 48(k), Congress recognized that more than one taxpayer may bear the risk of loss with respect to the production costs of *176 a film, and it authorized the Secretary of the Treasury to establish procedures for determining who is entitled to the credit or to a partial credit in such cases. S. Rept. 93-938, supra at 230. Under section 1.48-8(a)(4)(iii), Income Tax Regs., a taxpayer who, "at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof" is regarded as having a depreciable interest for purposes of the investment tax credit if such a taxpayer "can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film." In our recent opinion of Law, we stated that the "thrust of section 1.48-8(a)(4)(iii), Income Tax Regs., is to allow an investment tax credit to persons with an equity-like interest in the film, even if the interest does not amount to ownership or a depreciable interest, but to disallow it to pure creditors, such as commercial lenders." Law v. Commissioner,86 T.C. at 1111. *177 A "lender" under section 1.48-8(a)(4)(iii), Income Tax Regs., may be a person who has an open-ended financial interest in the exploitation of a film. Law v. Commissioner,86 T.C. at 1111-1112; see also, sec. 1.48-8(a)(4)(v), Income Tax Regs. Prior to the time the film was placed in service, Laurel paid Warner the amount of $1,125.000.00 to purchase a participation in the gross receipts from Warner's distribution of the film. Warner reduced its risk or investment in the production costs of the film to the extent of such payment. On the other hand, Laurel was at risk as to the production costs of the film in the amount of $1,125,000.00 as Laurel could look for repayment of such amount "solely to the proceeds generated from the exhibition or disposition of at least a part of the film." Compare Tolwinsky v. Commissioner,86 T.C. at 1064-1065, with Durkin v. Commissioner,supra, and Law v. Commissioner,86 T.C. at 1110. Consequently, petitioners are entitled to claim their proportionate *178 share of investment tax credit regarding Laurel's investment in the film. We conclude that Laurel's interest in the participation of the gross receipts of Warner's exploitation of the film was an ownership interest for purposes of section 48(k)(1)(A). Laurel was a "lender" within the meaning of the regulations as Laurel relied solely upon exhibition or disposition of the film for repayments. Based our determinations herein, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Sun Y. and Janet L. Wong, docket No. 11787-82; and David and Christine Pasant, docket No. 11789-82.↩
2. Unless otherwise specified, petitioner or petitioners shall refer to petitioner husbands.↩
3. The term "Net Producer's Share of Gross Receipts" is defined as receipts remaining after the deduction from gross receipts, any distributor fees and distribution expenses payable to Warner as distributor of the film and allocated as such under the agreement between Laurel and Warner as described infra.↩
4. The Laurel-Cincoa Agreement provided that the debt portion be satisfied no later than September 30, 1982. The June Promissory Note provided that the debt portion be satisfied no later than April 30, 1983. The discrepancy is not reconciled but is immaterial to our determinations.↩
5. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
6. Laurel claimed an amortization deduction in the amount of $2,500 representing the six months of partnership activity during the year in issue. Organization costs in the amount of $25,000.00 to be amortized were as follows: ↩
ORGANIZATION COSTS
Legal fee
$ 4,119.00
Accounting fee
5,000.00
Legal fee to Migdal, Tenney,
Glass & Pollak
15,881.00
$25,000.00
7. ↩
OTHER DEDUCTIONS
legal fee
$ 4,119.00
accounting fee
5,000.00
office expense
250.00
administrative fee
38,000.00
$47,369.00
8. See, n. 7, supra.↩
9. Limited partner guarantee arrangements may operate to provide the limited partner a pro rata share of the partnership recourse liabilities for basis and section 465 "at risk" purposes. Our inquiry is essentially factual. See Gefen v. Commissioner, 87 T.C.     (Dec. 20, 1986); compare Tolwinsky v. Commissioner,86 T.C. 1009, 1040↩ (1986).
10. Distributor's gross receipts are the amount received by the distributor from exhibitors including television broadcasts where Warner distributes the film directly to such parties.↩
11. Respondent accepted Laurel's use of the straight-line method of depreciation and two-year useful life dependent upon our determination that Laurel purchased its interest with an intention to derive an economic profit.↩
12. Sec. 183(a) provides that "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Sec. 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deduction allowable by reason of paragraph (1)." Sec. 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩."
13. Our analysis is based on the fact that this case was tried and briefed in terms of whether a profit objective existed under section 183. We recognize that Rose v. Commissioner,↩ 88 T.C.     (filed Feb. 5, 1987), adopts a test of economic substance in the category of "genuine" tax shelters. Our conclusion under that test would be the same.
14. Respondent concedes that Laurel is entitled to deduct interest to paid to Citibank in the amount of $40,800.00. Due to our determination that Laurel's motion picture activity was one engaged in for profit, respondent concedes that Laurel's treatment of office expenses and the amortization of organization costs was proper.↩
15. The parties do not dispute that "Bloodbrothers" is "new section 38↩" property which is a "qualified film."