LEONARD and BETTE ISENBERG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Isenberg v. Commissioner
Docket No. 14502-82.
United States Tax Court
T.C. Memo 1987-269; 1987 Tax Ct. Memo LEXIS 269; 53 T.C.M. (CCH) 946; T.C.M. (RIA) 87269; June 1, 1987. Jerome R. Rosenberg, for the petitioners. Anne Hintermeister and Kevin Yourman, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1975
[1] $1,307
1978
57,920
The issues for decision are: (1) Whether petitioners are entitled to an investment tax credit and miscellaneous deductions in relation to their investment in Crescent Associates, a limited partnership involved in the acquisition of certain film rights; (2) Whether petitioners may deduct amounts pursuant to advertising service agreements; and (3) Whether petitioners are liable for additional interest under section 6621(c). [2]
*272 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Leonard and Bette Isenberg, husband and wife, resided in California at the time of the filing of the petition in this case. During the years in issue, Leonard Isenberg (petitioner) was in the insurance business. In 1978, petitioner acquired a limited partnership interest in Crescent Associates (Crescent) on the advice of Ronald Spire of the law firm Berg & Spire. Petitioner's required contribution to the partnership was $90,000. Petitioner executed a "Limited Partnership Signature Page" dated December 2, 1978. Petitioner's limited partnership interest was paid for in part by a check dated November 22, 1978 in the amount of $30,000. Petitioner signed a negotiable promissory note dated November 22, 1978 payable to Crescent in the amount of $36,000 due on April 1, 1979. Petitioner signed a second promissory note in 1978 payable to Crescent in the amount of $24,000 which was due June 15, 1980. In connection with his entry into Crescent, petitioner signed agreements, dated November 22, 1978, guaranteeing *273 repayment of two loans to be made by Bank Hapoalim to Crescent in connection with "Advertising Service Agreements" as follows: Amount of Petitioner's
Amount of Loan
Guarantee
$1,110,000
$92,288.58
770,000
64,020.00
In connection with his entry into the partnership, petitioner also signed an agreement, dated November 22, 1978, guaranteeing payment of a $2,500,000 note of the partnership to the extent of $207,857.13. Crescent Associates
Crescent was formed for the purpose of entering into agreements for the purchase and distribution of the film "California Dreaming" and to enter into two "Advertising Service Agreements." Crescent elected to report its income and deductions using the cash receipts and disbursements method of accounting. A private placement memorandum explaining the transactions to be entered into by Crescent and a legal opinion as to the tax consequences of the transactions were prepared. The promoters of Crescent intended to raise a total of $1,053,000 by the sale of limited partnership interests. In addition to contributions to the capital of Crescent, the limited partners were required to execute guarantees of notes given *274 by Crescent to lending banks to finance "advertising service agreements," and to execute guarantees of a purchase money note given by the partnership to Sharmat Services, Inc. in connection with the purchase of California Dreaming. The amounts of the guarantees were in proportion to the limited partners' interests in the venture. The private placement memorandum indicated that the proceeds from the limited partnership offering would be used as follows: Amount
1978
Advertising Advance to AIP
$ 150,000
General Partner Management Fees
25,000
Administrative Costs
23,000
Organizational Costs
25,000
Syndication Costs
112,000
Reserve for Future Expenses
18,000
$ 353,000
1979
Down Payment for "California Dreaming"
700,000
$1,053,000
The certified public accounting firm Oppenheim, Appel, Dixon & Co. prepared a document entitled "Projection of Taxable Income and Cash Flow" for Crescent, dated November 20, 1978. The projections indicated the following returns to the investors: Receipts of
Receipts of
Receipts of Receipts of
$1,000,000 $7,000,000 $10,000,000 $15,000,000 Cash investment
per unit
$30,000 $30,000 $30,000 $30,000 Cumulative cash
distributions
from partnerships
10,228 17,884 26,532 Pre-tax profit (loss)
(30,000)
(19,772)
(12,116)
(3,468)
After-tax benefits [3]
37,945 29,151 33,319 31,403 *275 The cover letter attached to the projections included a statement that, The accompanying projection is based upon assumptions and information submitted by the management of Crescent Associates, as set forth in the notes to the projection. Since the scope of our engagement has been limited to assembly of the pertinent information in accordance with the assumptions and requirements accompanying the projection, we do not express an opinion as to the reasonableness, comprehensiveness or validity of the aforementioned assumptions, nor the degree of probability that projected taxable income and cash flow, as presented, will be realized. The general partners were to receive an initial sum of $250,000 to cover certain organizational expenses and as compensation for their partnership related activities. In addition, they were to receive 10 percent of the partnership cash flow before recoupment by the limited partners of their cash investment and 25 percent of the partnership cash flow after recoupment, as an administrative *276 and overhead fee. Both the general partners and the seller of the film were to receive a $25,000 deferred administrative fee in 1979. For the partnership's promissory note to be fully repaid and the limited partners to fully recoup their investment from distributions from the partnership the film would have to earn gross receipts of $16,000,000. The General Partners and Promoters
The general partners of Crescent are David Brein, Mark Warsky, and Sidney Abusch. Mark Warsky (Warsky) has a bachelor's degree in political science from the University of Arizona and a law degree which he earned at the University of Arizona Law School and Southwestern University School of Law in Los Angeles. Warsky has been involved in establishing several partnerships similar to the one here in issue. David Brein (Brein) received a bachelor's degree in finance from the University of Arizona in 1974. From 1974 to 1976, Brein was employed as an account executive at an NBC television station in Arizona. Brein has been involved in several partnerships similar to the one here in issue. In 1977, Stephen Sharmat (Sharmat) was active in establishing motion picture limited partnerships and had substantial *277 experience in the motion picture industry. Sharmat has been involved in approximately 30 such partnerships. Sharmat Services, Inc. (SSI) was a corporation incorporated in the State of Delaware, all of the stock of which was owned by Sharmat. Sharmat formed SSI to act as a broker in motion picture transactions. Sharmat was the only officer, director, or shareholder of SSI. In 1978 and at all relevant times since then, Sidney Abusch (Abusch) has been a certified public accountant in Kings Park, New York. Abusch became involved in the motion picture industry in 1977 when Sharmat arranged for him to serve as the partnership accountant for several of the partnerships in which Sharmat was involved. At the time, Abusch was Sharmat's accountant and prepared Sharmat's personal returns. Sharmat formed SSI on the advice of Abusch and Abusch advised Sharmat regarding certain SSI business transactions. DAVMAR Group, Ltd. (DAVMAR) was a corporation formed by Brein and Warsky in 1977. Brein and Warsky were the only shareholders, officers, and directors of DAVMAR and Abusch was the accountant for DAVMAR. Brein and Warsky were involved in selling limited partnership interests as general *278 partners and through DAVMAR. Sharmat introduced Brein and Warsky to employees of American International Pictures, Inc., involved in motion picture financing. Crescent was one of the first tax shelter transactions done by Brein and Warsky. Warsky, Brein, and Sharmat were associated in other motion picture tax shelter transactions having the same or similar format to Crescent. Warsky and Brein also sold limited partnership interests in other motion picture partnerships where Sharmat was a partner. Sharmat, Brein, and/or Warsky have been involved in acquiring interests in such films as: "Grey Eagle"; "The Dark"; "C.H.O.M.P.S." starring Valerie Bertinelli; "Something Short of Paradise" starring David Steinberg and Susan Sarandon; "Going in Style" starring George Burns, Art Carney, and Lee Strasburg; "Caddyshack" starring Chevy Chase, Rodney Dangerfield, and Bill Murray; "The Awakening" starring Charlton Heston and Stephanie Zimbalist; and "The Earthling" starring William Holden and Ricky Schroeder. American International Pictures
American International Pictures, Inc. [4] (AIP), was in the business of producing and distributing motion pictures to theaters and television sources. *279 AIP's reputation in the motion picture industry was as a producer and distributor of low-budget and successful exploitation material. AIP's main business is the distribution of motion pictures and AIP generally produces motion pictures in order to have motion pictures to distribute. AIP financed production and distribution from three main sources: (1) working capital; (2) bank loans; and (3) investments by third parties. David Melamed (Melamed) was the vice president of finance for AIP at the end of 1978 and was responsible for the finance and accounting of the company. Melamed's duties included arranging motion picture financing including bank loans and investments by third parties. Jerome Schwartz (Schwartz) was employed as vice president and general counsel of AIP in 1978. Schwartz' duties included supervision of the legal department and handling of business affairs in connection with productions, including negotiations with producers writers, and directors. AIP had a bank credit line ranging from $25,000,000 to $35,000,000 during the years *280 in issue, but required additional funding for its business transactions. As a result, AIP entered into various types of deals with third parties to provide additional working capital for production and distribution of its motion pictures. One such deal utilized by AIP was "co-production," a type of joint venture with other motion picture distributors or producers whereby the distribution rights and production costs would be shared. AIP also obtained third-party funding for production and distribution costs by entering into "tax shelter deals." These tax shelter deals took the form of production service deals, purchase deals, or advertising deals. Production service deals involved a company consisting of investors which provided production services and funds to be used for production of the picture. In return, the production service company got a share of the profits. In purchase or acquisition transactions third parties contributed funds to AIP in the form of a purchase price either before or after completion of the film. AIP started doing production service deals in 1973 and started doing acquisition deals in 1975. A third type of tax shelter deal done by AIP was a distribution *281 type deal where investors would provide funds for the releasing course of the picture, including advertising. In return, these investors would share in the profits from a motion picture. AIP entered into advertising service deals in order to obtain funds to cover its advertising expenditures. AIP attempted to get two tax shelter deals -- one limited partnership providing funds under a production services agreement and a second limited partnership providing funds under an acquisition agreement -- for every picture which it produced at the earliest stage possible. AIP also entered into third-party funding deals to limit the risk of failure of a picture since the funding obtained in that manner was repayable solely out of the proceeds of the film. In AIP's view, the tax shelter deals allowed AIP to shift part of the risk to third parties in return for giving up part of its profits interest in the motion picture. AIP generally paid the individuals who arranged the tax shelter deals a fee equal to 10 percent of the cash they obtained for AIP. Sharmat was involved in many of AIP's third-party funding transactions. The terms of the tax shelter funding deals entered into by AIP and *282 Sharmat were reduced to a formula. AIP always entered into a distribution contract in situations where it obtained third-party funding. AIP would not have permitted an entity providing third-party funding to use another distribution company. Most of the distribution contracts between AIP and entities providing third party funding gave AIP the right to distribute the film in perpetuity. AIP's typical distribution fee for domestic theatrical receipts was 35 percent in the 1970's. AIP-Fascination Agreements
In September 1976, AIP entered into a production, financing, and distribution agreement with Fascination, Inc. (Fascination) regarding "California Dreaming," then also known as "State Beach." The agreement was amended on April 7, 1977 and December 15, 1978. The AIP-Fascination agreement provided that Fascination would assign the literary property containing the plot of "California Dreaming" to AIP and that Fascination employees would supervise preparation of the screenplay, undertake pre-production activities and the actual production of the film and deliver a completed film to AIP. The AIP-Fascination agreement contemplated that principal photography for the film would *283 commence on October 3, 1977 after an eight-week pre-production period, and that the completed film would be delivered to AIP on February 15, 1978. The film's cast included Dennis Christopher, whose other film appearances include parts in "Breaking Away" and "Chariots of Fire," and Tanya Roberts who also appeared in "A View to a Kill," among other movies, and the television series "Charlie's Angels." The director of the film was John Hancock who had also directed the film "Bang the Drum Slowly." The AIP-Fascination agreement provided that the picture would be financed by AIP with AIP retaining "the right to obtain outside financing or co-financing from independent sources or from a so-called 'tax shelter' group(s)" and to change "certain budget items in order to accommodate the tax shelter deals." Fascination agreed to cooperate fully in effectuating such tax shelter deals. The agreement specified that the budget of the picture would include "financial fees (i.e. finders fees) not to exceed 10 % of the amount of all so-called 'tax shelter' investments." The AIP-Fascination agreement provided that AIP would be the sole worldwide distributor of the film and would receive distribution *284 fees as a percentage of gross receipts. The agreement also provided for AIP's recoupment of certain costs and for AIP's participation in the remaining gross receipts. AIP obtained financing for "California Dreaming" by entering into a production service tax shelter agreement, dated October 4, 1977, with Cinema 77 (No. 4), a West German entity. Pursuant to this agreement, the production cost of the film was to be financed with $700,000 from Cinema 77 (No. 4) and $2,453,327 in bank loans, for a total production cost of $3,153,327. The agreement contemplated that the picture would be completed on or about May 1, 1978. The agreement provided that Cinema 77 (No. 4) "acquired and owns all right, title and interest in the screen play and all motion picture rights to 'State Beach.'" SSI-AIP Agreements
SSI entered into a document entitled "Acquisition Agreement" with AIP, dated November 1, 1978, with respect to California Dreaming. The acquisition agreement stated that it conveyed to SSI all of AIP's "right, title, privileges, interest, ownership and claims of any kind or character whatsoever which it now has or at any time heretofore had in and to the Picture" throughout the *285 world. AIP warranted in the acquisition agreement that the production budget of the film was not less than $3,000,000. At the closing, SSI gave AIP $10,000 and two notes, dated November 1, 1978, in connection with the acquisition, which notes consisted of (1) a negotiable promissory note in the amount of $790,000 due April 1, 1979; and (2) a nonrecourse promissory note in the amount of $2,400,000 due November 1, 1985. Pursuant to a "Security Agreement," SSI granted AIP a security interest in the film to secure payment of the nonrecourse note. AIP and SSI entered into a distribution agreement with respect to the film dated November 1, 1979. Pursuant to the distribution agreement, AIP was to possess "the sole, exclusive and irrevocable right, license and privilege under copyright to rent, lease, license, exhibit, distribute, reissue, deal in and with respect to the Picture and prints or any part thereof, and trailers thereof, and to license others to do so, * * * theatrically and non-theatrically, and by means of television in all forms, whether now known or hereafter to be known, and by means of wire, cartridges, cassettes and any and all other means of projection, transmission, *286 broadcasting and exhibition * * * throughout the entire world * * * in perpetuity." The distribution agreement provided that the gross receipts from exhibition of the picture were to be allocated in the following order: (1) distribution fee to AIP, computed as a percentage of gross receipts ranging from 25 percent to 40 percent; [5] (2) recoupment by AIP of all of its distribution expenses; and (3) the balance to be divided as net producer's share. The net producer's share was to be divided as follows: (1) 75 percent to AIP to be applied to the nonrecourse note and 25 percent to SSI, until $2,400,000 is paid on the note and SSI had recouped $800,000; (2) thereafter 87-1/2 percent to AIP to be applied to the nonrecourse note and 12-1/2 percent to SSI, until the principal and interest due on the note had been paid; and (3) thereafter 87-1/2 percent to AIP (designated as an additional distribution fee) and 12-1/2 percent to SSI. *287 In the distribution agreement, AIP reserved the right to take the full amount of any tax credits, except that SSI was entitled to an investment credit based upon 25 percent of the film's purchase price or $800,000, the amount of the cash investment. The acquisition agreement, however, provided that the purchaser would have the right to any investment tax credit which might be available to the purchaser. Both the distribution agreement and the acquisition agreement represented that the cost of the picture was not less than $3,000,000. SSI and AIP also entered into a security agreement and AIP furnished SSI with a bill of sale. The various agreements between SSI and AIP were executed on behalf of AIP by Jerome Schwartz (Schwartz). A document entitled "Copyright Assignment" and a document entitled "Mortgage and Assignment of Copyright," both dated November 1, 1978, were also executed as part of the AIP-SSI transactions. SSI made payments by check to AIP as follows: Date
Amount
12/27/78
$ 10,000
4/1/79
100,000
4/12/79
150,000
4/17/79
100,000
5/1/79
50,000
5/14/79
240,000
5/25/79
150,000
$800,000
AIP paid Sharmat $80,000 as a financing fee in *288 connection with the California Dreaming transaction. Sharmat did not obtain an appraisal of California Dreaming before arranging for SSI to acquire an interest in the film. Crescent-SSI Agreements
Brein and Warsky viewed California Dreaming at AIP's premises in July 1978. Brein had discussed the film with Sharmat in late summer of 1978. Brein was organizing Crescent at the time. When the 1978 agreements between AIP and SSI were finalized, it was contemplated that the film would be immediately resold by SSI to Crescent. Sharmat viewed SSI as a broker or middleman in the Crescent transaction. When SSI purchased California Dreaming, it did so on behalf of Crescent with the intention of transferring it immediately to Crescent. Brein and Warsky reviewed the SSI-AIP acquisition agreement before it was finalized. Crescent entered into an agreement with SSI entitled "Acquisition Agreement," dated December 1, 1978 with respect to the motion picture California Dreaming. Under the Crescent-SSI acquisition agreement, SSI transferred to Crescent all of its interest in California Dreaming except for the domestic and international television syndication rights. SSI furnished Crescent *289 with a document entitled "Bill of Sale." The purchase price of $3,250,000 specified in the acquisition agreement was to be paid by delivery of (1) $800,000 cash by April 1, 1979 and (2) a promissory note in the amount of $2,450,000. The promissory note was due on December 2, 1987 and bore interest at a rate of 10 percent per annum. The acquisition agreement specified that when theatrical gross receipts exceeded $4,500,000 or television gross receipts exceeded $1,000,000, the note would become a nonrecourse note. SSI determined the amount of gross receipts used in the agreement to trigger conversion of the note to a nonrecourse note. Brein and Warsky were aware that SSI had acquired California Dreaming with a nonrecourse note. Brein and Warsky did not get an appraisal of the fair market value of California Dreaming or an expert opinion as to the amount the film could be expected to earn before acquiring it on behalf of Crescent. The private placement memorandum stated that the partnership would enter into a distribution agreement with AIP. The acquisition agreement provided that 1) Crescent would enter into a distribution agreement with AIP, 2) the rights to exclusive and unconditional *290 possession of the film would be retained by AIP, and 3) Crescent's purchase money note was to be paid in accordance with the distribution agreement. Crescent acquired the film subject to the SSI-AIP distribution agreement. That distribution agreement was the only distribution agreement executed by the parties. Sharmat retained the television syndication rights and $50,000 of the purchase price. Distribution of California Dreaming
AIP's distribution of California Dreaming began with the running of the film in Yuma, Arizona from December 27, 1978 through January 1, 1979. The general release of the film, however, did not commence until April 1, 1979. The early running of California Dreaming in Yuma, Arizona as a double feature with "Force 10 From Navarone" generated total gross receipts of $1,717.20 and was considered by AIP officials to be a "run required by Bill Sharmatt [sic]." As of June 26, 1984, the distribution of California Dreaming had produced domestic film rentals amounting to $1,224,579.03 and foreign film rentals amounting to $205,721.44, for a total of $1,430,300.47. Advertising Service Agreements
Crescent also entered into three "advertising service *291 agreements" with AIP. In an advertising service agreement dated November 1, 1978 (Advertising Agreement No. 1), Crescent agreed to provide AIP with $1,260,000 on or before December 31, 1978 to be used by AIP to advertise the film "Force Ten From Navarone" and other AIP films. In return, AIP was to pay to the partnership $1,260,000 out of 100 percent of the film rentals derived by AIP from all sources commencing upon release of "Force Ten From Navarone" and to pay the partnership a contingent fee equal to 1 percent of all film rentals in excess of $25,000,000. In a second advertising service agreement dated November 1, 1978 (Advertising Agreement No. 2), Crescent agreed to provide AIP with $1,100,000 during 1979 to be used by AIP to advertise California Dreaming and other AIP films. In return, AIP was to pay to the partnership $1,100,000 out of 100 percent of the film rentals derived by AIP from all sources commencing upon release of California Dreaming and to pay the partnership a contingent fee equal to 1 percent of all film rentals in excess of $25,000,000 from "Force Ten of Navarone." In a third advertising service agreement (Advertising Agreement No. 3), dated March 1, 1979, Crescent *292 agreed to provide AIP with $770,000 during 1979 to be used by AIP to advertise California Dreaming and other AIP films. In return, AIP was to pay to the partnership $770,000 out of 100 percent of the film rentals derived by AIP from all sources commencing upon release of California Dreaming. This advertising agreement did not provide the partnership with an additional contingent fee. The advertising service agreements were executed by Schwartz on behalf of AIP. AIP was required to furnish the partnership with monthly accountings beginning December 31, 1978 in the case of Advertising Agreement No. 1 and beginning December 31, 1979 in the case of Advertising Agreement No. 2. Advertising Agreement No. 3 did not require an accounting. The private placement memorandum did not disclose that the partnership would enter into Advertising Agreement No. 2. The memorandum provided that the limited partners would be required to guarantee payment of two partnership loans to be used to acquire the funds to be provided to AIP pursuant to Advertising Agreements Nos. 1 and 3. Brein and Warsky discussed the advertising agreements with Sharmat prior to their execution. Sharmat discussed the agreements *293 with AIP officials. AIP dealt directly with the advertising firms in obtaining advertising services. AIP guaranteed bank loans to the partnership which were used by the partnership to satisfy its obligations under the advertising agreements. Most of the advertising invoices were submitted to AIP and were paid from a special bank account created for this purpose in the partnership's name which contained the loan proceeds. The amounts not from the partnership's checking account were paid from an AIP checking account and were reimbursed to AIP by the partnership. AIP employees had authority to sign checks paying for advertising services from the partnership's checking account. Crescent funded its obligations under Advertising Agreement No. 1 by using $150,000 cash and by means of a $1,110,000 loan from Bank Hapoalim. Crescent gave a promissory note evidencing a loan of $1,110,000 to Bank Hapoalim. The note, dated December 29, 1978, was due January 31, 1979. The note bore interest at a rate of 11-1/2 percent per annum. Bank Hapoalim issued a credit advice to Crescent dated December 29, 1978, stating that the loan proceeds of $1,110,000 had been credited to Crescent's checking *294 account number XXXX1369 at Bank Hapoalim. Crescent had opened checking account number XXXXXX69-01 at Bank Hapoalim on November 16, 1978. AIP officials were authorized to sign checks drawn on this account. Crescent made the following payments from the Bank Hapoalim checking account pursuant to the Advertising Agreement No. 1: (1) a check from Crescent to AIP dated December 12, 1978 in the amount of $414,041.76; and (2) a check from Crescent to Diener, Hauser, Greenthal & Co, Inc. (Diener, Hauser), dated December 28, 1978, in the amount of $845,958.24. AIP furnished Crescent with an invoice, dated December 4, 1978, for "Reimbursement due for advertising costs paid by American International Pictures, Inc., on behalf of Crescent Associates" in the amount of $414,041.76. AIP had paid these advertising costs during November 1978 directly to the vendors by means of 95 separate checks drawn on AIP's checking account. AIP's November 1978 payments were in response to invoices dated from May 1977 through October 1978 submitted to AIP from suppliers of advertising services. Diener, Hauser issued an invoice to AIP dated December 4, 1978 for television advertising in the amount of $931,512. *295 Crescent issued a check dated December 28, 1978 to Diener, Hauser in the amount of $845,953.24. The remaining portion of the Diener, Hauser invoice, i.e., $85,553.76, was paid by AIP by means of a check drawn on an account for Selby Associates, another 1978 partnership promoted by Brein, Warsky, and Sharmat. The 1979 advertising expenses paid pursuant to Advertising Agreements Nos. 2 and 3 were paid from checking account number XXXXX0157 at City National Bank. The title of the account was Crescent Associates, New York Ltd. Partnership, Attn' Lucy Keister, c/o American International Pictures, Inc. Invoices for advertising expenses were addressed to AIP and submitted to AIP by the advertisers from April 1979 through November 1979 for advertising services rendered during that time. Checks drawn on the City National Bank checking account were used to pay advertising invoices submitted to AIP. The checks were dated August 21, 1979 through December 10, 1979 and totalled $1,878,300. The checks were signed by AIP employees Helen Russ, Lucy Keister, and David Melamed. None of the checks was signed by the general partners. The source of the deposits to the City National Bank were *296 loans from City National Bank to Crescent. The loans bore interest at a rate of 11-1/2 percent per annum. The amounts, dates of execution, and maturity dates of the loans taken by Crescent to fund the advertising service agreements and the dates they were paid are as follows: Date of
Maturity
Lender
Amount
Execution
Date
Date Paid
Bank Hapoalim
$1,110,000
12/29/78
1/31/79 1/8/79
City National Bank
500,000
10/27/79
1/5/80
1/9/80
City National Bank
400,000
8/14/79
1/5/80
1/9/80
City National Bank
370,000
11/8/79
1/5/80
1/9/80
City National Bank
610,000
9/12/79
1/5/80
1/9/80
Interest of $46,465.75 was due during 1980 with respect to loans related to the Advertising Agreements Nos. 2 and 3. Interest of $7,200 was due during 1979 with respect to loans related to those two agreements. OPINION As a result of the above described transaction, petitioner claimed an investment tax credit, deductions for the advertising expenditures, and other miscellaneous deductions. Respondent has put forth a variety of grounds for disallowing the claimed investment tax credit and deductions. California Dreaming Purchase
While *297 the names and numbers differ, the film transaction presented in this case is in substance indistinguishable from that dealt with in our recent case of Vandenhoff v. Commissioner,T.C. Memo. 1987-116. In Vandenhoff a production company (Warner) allegedly sold a film (Bloodbrothers) to a corporation (Cincoa) which had a single shareholder (Rosenthal) for cash and a nonrecourse purchase money note. Cincoa then sold the film to a partnership (Laurel), of which the taxpayer therein was a limited partner, for cash and a contingently recourse debt. Sharmat, the sole shareholder of SSI, was one of the general partners of the partnership therein and was involved with structuring the terms of the transaction in Vandenhoff.[6]
In Vandenhoff we held that: (1) no business purpose existed for Cincoa's participation *298 in the transaction and such participation was to be ignored for Federal tax purposes (slip op. at 21-24); (2) the limited partner guarantees of the partnership's debt to Cincoa were not bona fide and were to be disregarded (slip op. at 25); (3) the partnership did not acquire an ownership interest in the film (slip op. at 30); (4) while the transaction was not devoid of economic significance beyond anticipated tax benefits, the partnership acquired only a speculative future profits interest in the exploitation of the film (slip op. at 29-30); (5) the partnership was not entitled to depreciation on the film but could depreciate its intangible contractual right to participate in the gross receipts generated by the film, utilizing the straight-line method over a two year period (slip op. at 35-36, 39); (6) the partnership's basis in its intangible contractual right did not include the debt portion of the acquisition agreement (slip op. at 39); (7) the partnership's investment was an activity engaged in for profit (slip op. at 41); (8) the miscellaneous deductions of the partnership there in issue were either syndication or organizational expenditures (slip op. at 43-45); and (9) the partnership *299 was entitled to an investment tax credit based upon the cash paid to acquire a participation in the gross receipts produced by the film (slip op. at 48). With respect to Crescent's involvement in California Dreaming, our conclusions are substantially the same as the conclusions arrived at in Vandenhoff, as set out above. We will summarize the analysis which leads to our conclusions in this case, but we rely on our opinion in Vandenhoff as a more exhaustive explanation of our conclusions. An extensive reiteration of our analysis in Vandenhoff would serve little use. Initially, we must deal with SSI's participation in the transaction. The parties contemplated at the time SSI entered into the transaction that the film would be resold to Crescent for substantially the same purchase price and down payment which SSI had paid to acquire the film. The only significant differences in the two transactions were that (1) SSI retained the television syndication rights, (2) Crescent's purchase price was $50,000 higher than SSI's purchase price, and (3) the debt obligation executed by Crescent purported to be recourse in nature. It is apparent from the record that the role of *300 SSI was to provide a means by which the partnership could appear to purchase the film on a recourse basis for purposes of the at risk provisions of section 465, while not actually extending recourse rights to an outside party. [7] SSI's retained rights in the transaction were inserted in order to create the appearance of business purpose and were incidental to the transaction. As SSI's participation in the transaction was solely for tax characterization purposes, it is to be ignored for purposes of determining Crescent's tax consequences resulting from the transaction. See Knetsch v. United States,364 U.S. 361 (1960); Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). *301 We next consider the substance of Crescent's obligation under the acquisition agreement. The purchase obligation executed by SSI in favor of AIP was nonrecourse, while the purchase obligation executed by Crescent in favor of SSI was recourse in form. Petitioners' have argued that the reason for Crescent's obligation being recourse was that Sharmat wished to protect his reputation by being able to collect against the partnership and satisfy SSI's obligation to AIP. SSI's only obligation to AIP, however, was to make payments out of the proceeds from exploitation of the film. Further, from its inception the transaction was contemplated as including both SSI and Crescent. From this perspective, concern for AIP's assurance of being paid could have been better served either by the partnership's recourse obligation running in favor of AIP or by having SSI execute a recourse obligation. The purpose of creating an allegedly recourse obligation running from Crescent to SSI, however, was to satisfy the requirements of the at risk provisions of section 465. The circumstances surrounding this transaction and the relationship between Sharmat and the general partners of Crescent lead us to *302 the conclusion that the parties did not intend to enforce the recourse provisions of the partnership's obligation to SSI. Accordingly, petitioners' guarantees of Crescent's obligation to SSI are to be disregarded. [8]
A review of the record also leads us to the conclusion that the partnership did not acquire an ownership interest in the film California Dreaming. Rather, we believe that Crescent acquired a speculative future profits interest in AIP's exploitation of California Dreaming.[9]For Federal tax purposes, the sale of a motion picture occurs when all substantial rights of value in the motion picture copyright are transferred. Such a sale has not *303 occurred if the transferor retains proprietary rights in the motion picture. Durkin v. Commissioner,87 T.C. 1329 (1986); Tolwinsky v. Commissioner,86 T.C. 1009, 1042-1043 (1986). A motion picture copyright includes the exclusive rights to produce copies of the motion picture, prepare derivative works based upon the motion picture, distribute copies of the motion picture to the public by sale or rental, exhibit the motion picture to the public, and display to the public still photographs taken from the motion picture. 17 U.S.C. sec. 1 (1976); 17 U.S.C. sec. 106 (1982) (effective Jan. 1, 1978). *304 For Federal tax purposes, whether the benefits and burdens of ownership have been transferred is a factual determination. Leahy v. Commissioner,87 T.C. 56, 66 (1986). Factors which are relevant to this determination include: (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property. See Grodt & McKay Realty, Inc. v. Commissioner, [77 T.C. 1221, 1237-1238]. * * * [Houchins v. Commissioner,79 T.C. 570, 591 (1982); Fn. ref. omitted.] A thorough review of the record convinces us that AIP retained complete and exclusive control of the economic interests in California Dreaming. SSI purportedly received the film and copyright from AIP and then allegedly conveyed *305 such rights, less television syndication rights, to Crescent. The conveyance of rights to Crescent, however, was subject to the distribution agreement entered into by SSI and AIP. Pursuant to the distribution agreement, AIP was to possess the sole, exclusive and irrevocable right, license and privilege under copyright to rent, lease, license, exhibit, distribute, reissue, deal in and with respect to the Picture and prints or any part thereof, and trailers thereof, and to license others to do so, * * * theatrically and non-theatrically, and by means of television in all forms, whether now known or hereafter to be known, and by means of wire, cartridges, cassettes and any and all other means of projection, transmission, broadcasting and exhibition * * * throughout the entire world * * * in perpetuity. Such a combination of rights constitute virtually the entire bundle of rights that is a copyright. Durkin v. Commissioner,supra;Tolwinsky v. Commissioner,supra.This distribution agreement in fact transferred all of the basic rights associated with the copyright to AIP, leaving Crescent with mere "bare" copyright. The distribution *306 agreement also provides for the allocation of the gross receipts earned from the exploitation of the film. The gross receipts are allocated first to AIP's distribution fee, ranging from 25 percent to 40 percent depending upon the type of receipt, and recoupment by AIP of its distribution expenses. Any remaining gross receipts were to be allocated: (1) 75 percent to AIP to be applied to the nonrecourse note and 25 percent to SSI, until $2,400,000 is paid on the note and SSI had recouped $800,000; (2) thereafter 87-1/2 percent to AIP to be applied to the nonrecourse note and 12-1/2 percent to SSI, until the principal and interest due on the note had been paid; and (3) thereafter 87-1/2 percent to AIP (designated as an additional distribution fee) and 12-1/2 percent to SSI. Crescent effectively stepped into SSI's position with respect to the distribution agreement and the allocations provided by the distribution agreement were controlling with respect to Crescent's interest in the gross receipts earned from the exploitation of California Dreaming. The allocation of gross receipts in excess of breakeven is indicative of the benefits of ownership of the film which would inure to AIP. *307 Further, the distribution agreement did not have a limited term and, as a result, the amount of profit which AIP could receive from its distribution efforts was not limited. Based upon AIP's complete control over the exploitation of the film and AIP's 87-1/2 percent interest in the gross receipts from the film in excess of breakeven, we conclude that Crescent purchased a 12-1/2 percent interest in the gross receipts from the exploitation of California Dreaming in excess of breakeven. Our conclusion that AIP, rather than Crescent, is the true owner of California Dreaming does not require us to view the transaction as one which is wholly lacking in economic substance and which must therefore be disregarded for Federal tax purposes. [10] Rather, we view this transaction as one in which Crescent acquired an intangible contractual right which is to be recognized for Federal tax purposes. [11]
*308 We next consider respondent's contention that the Crescent transaction was not engaged in for profit. Whether an activity is one engaged in for profit depends upon whether the taxpayer has a bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). The determination is to be made based upon a consideration of all facts and circumstances. Sec. 1.183-2(b), Income Tax Regs.; Jasionowski v. Commissioner,supra.After a thorough review of the record, we believe that Crescent's participation in the California Dreaming transaction was one engaged in for profit. [12]
Sharmat was experienced in the motion picture industry and advised *309 Brein and Warsky with respect to the California Dreaming transaction. Sharmat, Brein, and Warsky were involved with numerous partnerships and motion pictures, some of which featured well known and successful actors and actresses. Further, AIP was very experienced in the production and distribution of motion pictures and had a reputation in the motion picture industry of being a successful producer and distributor of low-budget productions. AIP had warranted that the production budget of the film was not less than $3,000,000. Although it failed to produce a profit, distribution of the film did produce rentals of at least $1,430,300.47, indicating that substantial distribution efforts were made. The experience level of the parties involved in the transaction, the distribution efforts actually made by AIP, and recognition that the motion picture industry is a high risk industry, lead us to the conclusion that Crescent's acquisition of its participation in the gross receipts from California Dreaming was an activity engaged in for profit. [13]
*310 On its Form 1065, U.S. Partnership Return of Income, for the taxable year 1978 the partnership deducted (1) $25,000 as a guaranteed payment to the general partners, (2) $417 as amortization of organizational expenses totalling $25,000, (3) office expenses of $530, and (4) telephone expenses of $1,562. Respondent alleges that these amounts have neither been substantiated by petitioners nor shown by petitioners to be amounts which were not in the nature of syndication expenses. For a partnership to be able to deduct a guaranteed payment, the payment must satisfy the requirements of section 162, and the provisions of section 263 must be taken into account. Sec. 1.707-1(c), Income Tax Regs.; Cagle v. Commissioner,63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976). Payments allocable to organizational costs and syndication expenses must be capitalized. If elected, organizational costs are amortizable over a 60-month period, but syndication costs may not be amortized. Secs. 263, 709; Estate of Boyd v. Commissioner,76 T.C. 646, 658 (1981). *311 The taxpayer must establish the portion of the fee allocable to nondeductible capital expenditures and the portion allocable to deductible expenses. Estate of Boyd v. Commissioner,supra.This allocation of the guaranteed payment must reasonably comport with the value of the services performed. Wildman v. Commissioner,78 T.C. 943, 958 (1982). A review of the record in this case convinces us that the guaranteed payment in the amount of $25,000 deducted by the partnership was in the nature of a syndication expense which must be capitalized. Secs. 263, 709. The section of the offering memorandum entitled "FEES" provided that the general partners were to receive initial fees of $250,000 from which the syndication expenses were to be paid. The balance of the payment in excess of these expenses was to be retained by the general partners as "compensation for their services to the Partnership in organizing the Partnership, negotiating the purchase of the picture, the distribution agreement, financing agreements and the management of this offering." The general partners were also to receive administrative and overhead fees as a percent of the *312 partnership's cash flow. We find that the $25,000 guaranteed payment was in the nature of a syndication expense as described in the offering memorandum. The guaranteed payment was an initial fee to be paid in the year of organization and syndication, and additional fees were to be paid to the general partners. Petitioners have failed to establish that any portion of the guaranteed payment was other than a syndication expense. Pursuant to section 709(b), amortization deductions for organizational expenses are allowed to the extent such expenditures are (1) incident to the creation of the partnership, (2) chargeable to capital account, and (3) of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life. Petitioners have not shown that the $25,000 claimed as an organizational expense was in fact spent on organizing the partnership rather than syndicating interests in the partnership nor have they offered proof that such amount was actually paid out by the partnership in 1978. While we would assume that the partnership *313 must have incurred some organizational expenses, we have no basis for determining the reasonableness of the amount claimed by the partnership. Accordingly, petitioners are not entitled to claim a portion of the organizational expenses which were treated as amortizable organizational expenses on Crescent's 1978 return. The Crescent return for 1978 also claimed deductions for office expenses in the amount of $530 and telephone expenses in the amount of $1,562. Respondent argues that at least some part of these amounts relate to organizational expenses, expenses related to acquisition of the film, and syndication expenses. Abusch testified that the office expenses related to paper supplies, postage, and bank charges and that the telephone expenses related mainly to calls between New York and California. Petitioners have offered no other evidence to establish the purpose for which these expenses were incurred. This evidence is insufficient to overcome the presumption of correctness which attaches to respondent's determination. See Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Accordingly, petitioners are not entitled to deduct any portion of these *314 claimed expenses. Our last issue for consideration relating to the partnership's investment in California Dreaming is whether the partnership was entitled to an investment tax credit based upon its investment in the film. Section 38 provides that a taxpayer is entitled to an investment tax credit with respect to a motion picture film if such film is "new section 38 property" which is a "qualified film" [14] and limited to the extent that the taxpayer has an "ownership interest" in such film. Under section 48(k)(1)(C) a taxpayer's ownership interest in a qualified film is to "be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film." Section 1.48-8(a)(4)(iii), Income Tax Regs., provides that a taxpayer who, "at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof" is to be treated as having a depreciable interest for purposes of the investment tax credit if such taxpayer "can look for *315 repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film." Crescent paid $800,000 to purchase a participation in the gross receipts from California Dreaming and was at risk for this amount, being able to look for repayment of such amount "only to the proceeds generated from the exhibition or disposition of at least a part of the film." Therefore, petitioners are entitled to claim their proportionate share of investment tax credit from AIP's investment in California Dreaming. Such credit, however, is only available in the year in which the film is first placed in service. Sec. 1.48-8(a)(1), Income Tax Regs.
A motion picture is considered placed in service "when it is first exhibited or otherwise utilized before the primary audience for which the qualified film was created." Sec. 1.48-8(a)(5), Income Tax Regs. The regulations also provide *316 that, A qualified film is not placed in service merely because it is completed and therefore in a condition or state of readiness and availability for exhibition, or merely because it is exhibited to prospective exhibitors, sponsors, or purchasers, or is shown in a "sneak preview" before a select audience. [Sec. 1.48-8(a)(5), Income Tax Regs.] California Dreaming was first released in Yuma, Arizona as a double feature with "Force 10 From Navarone" from December 28, 1978 through January 1, 1979. In a letter from Malamed, the president of AIP, this release was described as "a run required by Bill Sharmatt [sic]." Other correspondence of AIP officials make it clear that at the time of the release of the film in Yuma, AIP was not prepared to generally release the film. Further, in a letter dated October 10, 1979 to the limited partners of Crescent, Brein and Warsky stated that the film had "been in general release since April 1." The record demonstrates that the release of the film in Yuma was for the purpose of securing an investment tax credit in 1978 and that such release was not the start of the general release of the film. Such a release does *317 not satisfy the regulations requirements for placing a film in service. Accordingly, petitioners were not entitled to claim their share of the partnership's investment tax credit until 1979. Advertising Service Agreements
In each of the advertising service agreements Crescent agreed to provide AIP with a stated amount of funds on or before end of the year in which the agreement was entered into to be used by AIP to advertise AIP films. In return, AIP was to pay the partnership the amount of the funds so provided out of 100 percent of the film rentals derived by AIP from all sources commencing upon release of either Force Ten From Navarone or California Dreaming. In two of the agreements AIP also agreed to pay the partnership a contingent fee equal to 1 percent of all film rentals from Force Ten From Navarone in excess of $25,000,000. AIP dealt directly with the advertising firms in obtaining the advertising services covered by the advertising service agreements. AIP guaranteed the bank loans which the partnership used to satisfy its obligations under the advertising agreements. Most of the advertising invoices were submitted to AIP and were paid from a special bank account *318 created for this purpose in the partnership's name which contained the loan proceeds. AIP employees had authority to sign checks paying for advertising services from this checking account. The amounts not paid from the partnership's checking account were paid from an AIP checking account and were reimbursed to AIP by the partnership. Crescent funded its obligations under the advertising agreements by using $150,000 cash and the proceeds from loans from Bank Hapoalim or City National Bank totalling $3,990,000. The amounts, dates of execution, and maturity dates of these loans and the dates they were paid are as follows: Date of
Maturity
Lender
Amount
Execution
Date
Date Paid
Bank Hapoalim
$1,110,000
12/29/78
1/31/79
1/8/79
City National Bank
500,000
10/27/79
1/5/80
1/9/80
City National Bank
400,000
8/14/79
1/5/80
1/9/80
City National Bank
370,000
11/8/79
1/5/80
1/9/80
City National Bank
610,000
9/12/79
1/5/80
1/9/80
Each of these loans was taken out within four and one-half months of the end of the year and paid off within nine days of the end of the year. The only loan taken out during the year 1978, a year here in *319 issue, was taken out three days prior to the end of the year and paid eight days after the end of the year. Petitioners have not explained the timing of the partnership's ability to pay off the loans shortly after the beginning of the year following the year in which the loans were taken out. Nor have petitioners explained why AIP would have needed to borrow $1,110,000 for advertising expenditures when such amounts would be repaid ten days later. This arrangement is more easily understood, however, when considered in light of the partnership's tax treatment of the amounts. The partnership treated the amounts provided to AIP as immediately deductible advertising expenditures, as if the partnership were in the trade or business of advertising. Identical amounts were then included in income in the next taxable year. Therefore, the partnership was able to create the deferral for one year of tax on $1,260,000 of its partners' 1978 incomes. The partnership's cost for creating this deferral was the interest accrued at an annual rate of 11-1/2 percent on $1,110,000 over a ten day period and the forbearance of the use of $150,000 for ten days. In substance this transaction consisted *320 of Crescent's providing AIP with short-term interest free financing in exchange for a profits interest in Force Ten From Navarone. AIP had complete control over the funds once they were provided by Crescent and AIP independently made all the decisions regarding the use of the funds for advertising its films. AIP, not Crescent, dealt with the parties providing the services and many of these services had been rendered prior to AIP and Crescent's entering into the advertising service agreements. Further, the timing of the repayment of the loans strongly suggests that the terms of the advertising service agreements which provided for the repayment of Crescent's investment out of the rental proceeds of the films were fictitious and that the actual arrangement was that AIP would repay such amounts shortly after the end of the year. Regardless of the repayment terms, however, Crescent was providing AIP with financing for its advertising (either on a recourse or nonrecourse basis) and was not itself incurring advertising expenses. Accordingly, petitioners are not entitled to deduct any portion of the amounts claimed by the partnership as advertising expenses. Section 6621(c)
*321 Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to a "substantial underpayment" (defined as an underpayment in excess of $1,000) attributable to a tax-motivated transaction. Section 6621(c)(3)(A) enumerates types of transactions which are to be considered "tax motivated transactions." These transactions include "(i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle * * *, (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period and (v) any sham or fraudulent transaction." Sec. 6621(c)(3)(A). The Treasury has promulgated temporary regulations which prescribe accounting methods "which may result in a substantial distortion of income." See sec. 301.6621-2T, Q&A-3, Proced. & Admin. Regs., T.D. 7998, 49 Fed. Reg. 50391 *322 (Dec. 28, 1984); 1985-1 C.B. 368. These regulations provide, in relevant part: Q-3. What accounting methods may result in a substantial distortion of income for any period under [section 6621(c)(3)(A)(iv)]? A-3. A deduction or credit disallowed, or income included, in any of the circumstances listed below shall be treated as attributable to the use of an accounting method that may result in a substantial distortion of income and shall thus be a tax motivated transaction that results in a tax motivated underpayment: * * * (4) Any deduction disallowed for any period under section 709, relating to organization or syndication expenditures of a partnership; * * * (9) In the case of a taxpayer who computes taxable income using the cash receipts and disbursements method of accounting, any deduction disallowed for any period because (i) the expenditure resulting in the deduction was a deposit rather than a payment, (ii) the expenditure was prepaid for tax avoidance purposes and not for a business purpose, or (iii) the deduction resulted in a material distortion of income * * * Our first consideration in determining the applicability of the provisions of section *323 6621(c) is to determine which of the deductions and credits claimed by petitioners, if any, were the result of tax motivated transactions within the meaning of section 6621(c)(3)(A). The partnership claimed an investment tax credit for its interest in the film. For purposes of the credit, however, the partnership claimed a basis of only $800,000, the amount of cash invested in the film by the partnership. We have determined that the partnership was entitled to claim an investment tax credit with respect to its interest in the film based upon the amount of cash it invested in the film, but that such credit should have been claimed in the taxable year 1979 rather than the taxable year 1978. Our decision that the partnership was not entitled to claim the credit in a year in issue turns upon the fact that the film was not placed in service in the year 1978. This reason for disallowing the credit in 1978 is not enumerated in either section 6621(c)(3)(A) or in the temporary regulations. As such, the underpayment attributable to the disallowance of the investment tax credit is not an underpayment attributable to a tax motivated transaction within the meaning of section 6621(c). With *324 respect to the partnership's claimed deductions for the guaranteed payment ($25,000), amortization of organizational expenses ($417), telephone expenses ($1,562), and office supplies ($530), our primary reason for disallowing these deductions was petitioners' failure to prove that such amounts were not syndication expenses within the meaning of section 709. The temporary regulations provide that a transaction resulting in any deduction disallowed pursuant to section 709 is to be considered the use of an accounting method which may result in a substantial distortion of income within the meaning of section 6621(c)(3)(A)(iv), and therefore a tax motivated transaction. These regulations were promulgated under the specific authority given the Secretary by section 6621(c)(3)(A)(iv). Accordingly, we find that the underpayment attributable to the disallowance of these deductions is an underpayment attributable to a tax motivated transaction. The last item disallowed was the claimed deduction for the payments made pursuant to the advertising service agreement. This amount was disallowed because the alleged payments were found to actually be in the nature of financing. In substance, the *325 advertising service agreements were an attempt to use the cash method of accounting to create an artificial deferral of income. The partnership attempted to deduct payments in one year which would be repaid at the beginning of the next year. We view this arrangement as an attempt to use the cash receipts and disbursements method of accounting to create a material distortion of income. While we recognize that our actual basis for disallowing the partnership's claimed advertising expense deduction was that the partnership did not incur advertising expenses, we believe that the facts leading to this conclusion are so integrally related to the partnership's attempt to create a distortion of income that the two holdings are inseparably related. Accordingly, we find that the disallowance of this deduction resulted from the use of an accounting method which may result in a substantial distortion of income within the meaning of Temporary Regulation section 301.6621-2T, Q&A-3(9)(iii). The underpayment resulting from such disallowed deduction is therefore attributable to a tax motivated transaction. We have held that to the extent the underpayment determined herein is based upon the miscellaneous *326 deductions of the partnership disallowed as syndication expenses and the claimed advertising expenses of the partnership, such underpayment is attributable to a tax motivated transaction. As petitioners' share of these deductions in 1978 was $107,045 and petitioners fully utilized these deductions in determining the amount of their taxable income, it is clear that petitioners' underpayment resulting from these tax motivated transactions was substantial within the meaning of section 6621(c)(2), i.e., greater than $1,000. Accordingly, petitioners are subject to the increased rate of interest on the portion of the underpayment which is attributable to the disallowance of the claimed miscellaneous deductions of the partnership and the claimed advertising expense deduction of the partnership. In order that the parties may submit calculations of the amount of the underpayment attributable to tax motivated transactions, Decision will be entered under Rule 155.
Footnotes
1. This amount is the result of a carryback of part of the investment tax credit claimed by petitioners in 1978 with respect to the film "California Dreaming." ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended, and in effect for the years in issue. Former section 6621(d) was redesignated as section 6621(c)↩ pursuant to section 1511(c), Tax Reform Act of 1986, 100 Stat. 2744.
3. The after-tax benefits were computed assuming the investor was taxed at a 50 percent rate and that tax savings were invested at a 5 percent interest rate.↩
4. Filmways Pictures, Inc., and Orion Pictures Corporation were successor corporations to American International Pictures, Inc.↩
5. The distribution fee was computed as a percentage of gross receipts as follows: ↩
Type of Receipt
Percentage
Domestic theatrical, non-theatrical,
and miscellaneous
30%
Domestic prime time network television
receipts
25%
All other domestic television
35%
Foreign theatrical, non-theatrical, and
miscellaneous
25%
Foreign television
40%
6. The parties in the two sets of transactions would match up as follows: ↩
Status of party:
Party in this case:
Party in Vandenhoff:
Production company
AIP
Warner
Middleman purchaser/
seller
SSI (Sharmat)
Cincoa (Rosenthal)
Partnership
Crescent
Laurel
General partners
Brein, Warsky, and
Glass and Sharmat
Abusch
7. In Vandenhoff v. Commissioner,T.C. Memo. 1987-116↩, we determined that no business purpose existed for the participation in the transaction by the middleman seller/purchaser corporation (Cincoa) and that such participation was to be ignored for Federal tax purposes. Slip op. at 21-24. We determined that the corporation was inserted into the transaction solely for characterization for tax purposes. We determined that the rights retained by the corporation were merely incidental and were inserted into the transaction to create the appearance of business purpose.
8. In Vandenhoff↩ we determined that the limited partner guarantees of the partnership's debt to Cincoa were not bona fide and were to be disregarded. Slip op. at 25. We found that Cincoa had no reason to require recourse assurances on the debt from the partnership because its purchase obligation to the production company was not recourse and that Cincoa did not intend to enforce the partnership's allegedly recourse obligation.
9. After reviewing the entire transaction in Vandenhoff↩ we concluded that the partnership therein did not acquire an ownership interest in the film. Slip op. at 30. While we found that the transaction was not devoid of economic significance beyond anticipated tax benefits, we determined that the partnership acquired only a speculative future profits interest in the exploitation of the film. Slip op. at 29-30.
10. A review of the facts and circumstances of this case convinces us that the transactions here at issue, as between Crescent and AIP, were not devoid of economic substance so as to be properly disregarded for Federal tax purposes. The dealings between AIP and Sharmat, Brein, and Warsky appear to have some indicia of arm's-length dealings and the contractual terms of the acquisition and distribution agreements bear economic significance indicative of a financial interest in the exploitation of the film. ↩
11. Our conclusion that AIP is the true owner of California Dreaming does require a finding that Crescent did not possess a depreciable interest in the film. Crescent's intangible contractual right to gross receipts from exploitation of the film, however, would constitute a depreciable interest. Durkin v. Commissioner,supra;Tolwinsky v. Commissioner,supra at 1052, 1053. The partnership did not claim a depreciation deduction in 1978 because it viewed the film as having been placed in service on December 28, 1978. In Vandenhoff↩ we found that the partnership therein had acquired a depreciable intangible contractual right but that the partnership's basis in such right was limited to the amount of cash used to purchase the right.
12. As was the situation in Vandenhoff, our analysis is based on the fact that this case was tried and briefed in terms of whether a profit objective existed under section 183. See Vandenhoff,↩ Slip op. at 40, n.13.
13. In Vandenhoff↩ we also found that the partnership's acquisition of its participation in the gross receipts of the film therein was engaged in for profit. Slip op. at 41.
14. Respondent has not alleged that the film failed to qualify as "new section 38↩ property" which is a "qualified film."